No. 24-3473, No. 24-3478, No. 24-3481, No. 24-3564

# IN THE UNITED STATES COURT OF
# APPEALS FOR THE EIGHTH CIRCUIT

---

Don Gibson, et al.,
*Plaintiffs-Appellees*
*v.*
National Association of Realtors, et al.,
*Defendants*
*v.*
Compass, Inc., et al.,
*Defendants-Appellees*
*v.*
James Mullis, Monty March, Robert Friedman, and Benny D.
Cheatham, et al.,
*Objectors-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
Case No. 4:19-cv-00788-SRB, Hon. Stephen R. Bough

---

## BRIEF OF DEFENDANTS-APPELLEES

---

Chahira Solh
Daniel A. Sasse
**CROWELL & MORING LLP**
3 Park Plaza, 20th Floor
Irvine, CA 92614
Telephone: (949) 263-8400
Facsimile: (949) 263-8414
csohl@crowell.com
dsasse@crowell.com

*Attorneys for Defendant-Appellee Compass, Inc.*
[Additional Counsel Listed on Signature Page]

## SUMMARY OF THE CASE

Plaintiffs-Appellees and Defendants-Appellees entered into settlements totaling more than $110 million in monetary relief and with industry-shifting practice changes in this long-running litigation alleging an antitrust conspiracy concerning broker compensation. The district court acted well within its discretion in approving the settlements. Objectors-Appellants' arguments opposing final approval are without merit.

The district court properly concluded that the settlements met Rule 23 requirements and were fair, reasonable, and adequate. The district court did not abuse its discretion in finding that the class's home buyer claims and claims related to non-National Association of Realtors multiple listing services shared the same factual predicate as the claims in the underlying action, nor in denying Objector-Appellant Cheatham's discovery request. The court did not err in requiring objectors to appear at the final settlement hearing, and even if it did, any such error was harmless because the court fully considered each objection on the merits.

Defendants believe oral argument would be useful to the Court and that 15 minutes is appropriate.

Appellate Case: 24-3478     Page: 2     Date Filed: 08/11/2025 Entry ID: 5546652

# CORPORATE DISCLOSURE STATEMENT

Pursuant to this Court's Local Rule 26.1A and Federal Rule of Appellate Procedure 26.1(a), Defendants-Appellees hereby disclose:

- Defendants-Appellees Douglas Elliman Inc., and The Real Brokerage Inc., are publicly-held corporations and have no parent corporation, and no publicly-held corporation owns 10% or more of their stock.

- Defendants-Appellees Five D I, LLC (d/b/a United Real Estate) ("United"), Realty ONE Group, Inc., HomeSmart International, LLC, Engel & Völkers Americas, Inc., Engel & Völkers GmbH, Douglas Elliman Realty, LLC, and Real Broker LLC certify respectively that:

    o United's parent company is United Real Estate Holdings, LLC (d/b/a United Real Estate Group);

    o Realty ONE Group, Inc.'s parent company is Realty ONE Group International, LLC;

    o HomeSmart International, LLC's parent company is HomeSmart Holdings, Inc.;

    o Engel & Völkers Americas, Inc. has the following direct or indirect corporate parents: Alster Intermediate GmbH & Co KG, Alster MidCo GmbH, Alster TopCo GmbH, Engel & Völkers GmbH, Engel & Völkers Holding GmbH, Engel & Völkers Residential GmbH, Permira VII Investment Platform S.à.r.l., Permira VII Investment Platform Limited, and Sevenplatform VII Limited;

    o Engel & Völkers GmbH has the following direct or indirect corporate parents: Alster Intermediate GmbH & Co KG, Alster MidCo GmbH, Alster TopCo GmbH, Engel & Völkers Holding GmbH, Permira VII Investment Platform S.à.r.l., Permira VII Investment Platform Limited, and Sevenplatform VII Limited;

ii

- o Douglas Elliman Realty, LLC is 99 percent owned by DER Holdings LLC, a wholly-owned subsidiary of Douglas Elliman Inc., and 1 percent owned by DER Holdings II LLC, which is 100 percent owned by DER Holdings LLC;

- o Real Broker LLC's parent company is Real Technology Broker Ltd., which is a wholly-owned subsidiary of The Real Brokerage Inc.; and

- o No publicly-held companies own 10% or more of the stock of these Defendants-Appellees.

- Defendant-Appellee At World Properties LLC certifies that:

  - o At World Properties Midco, LLC holds more than a 10% interest in At World Properties LLC.

  - o At World Properties Midco, LLC is indirectly owned by Compass, Inc., a publicly traded company.

- Defendant-Appellee Compass, Inc. certifies that:

  - o SVF Excalibur (Cayman) Limited holds more than 10% of the stock of Compass, Inc.

  - o SoftBank Group Corp., a public company, in turn holds more than 10% of the stock of SVF Excalibur (Cayman) Limited;

  - o The Vanguard Group, Inc., a public company, separately holds 10% of the stock of Compass, Inc.; and

  - o No other publicly-held company holds 10% or more of the stock of Compass, Inc.

- Defendant-Appellee Redfin Corporation certifies that:

  - o Redfin is a direct wholly owned subsidiary of Rocket Companies, Inc., a publicly held corporation.

iii

# TABLE OF CONTENTS

SUMMARY OF THE CASE ................................................................. i

CORPORATE DISCLOSURE STATEMENT ..................................... ii

TABLE OF AUTHORITIES ........................................................... vii

STATEMENT OF THE ISSUES ......................................................... 1

INTRODUCTION ........................................................................... 3

STATEMENT OF THE CASE ........................................................... 5

I.      The Original Lawsuits ......................................................... 5

II.     The Copycat Lawsuits ......................................................... 9

III.    The Settlements Below ...................................................... 12

IV.     The District Court Preliminarily Approved the
        Settlements ..................................................................... 18

V.      The District Court Granted Final Approval of the
        Settlements ..................................................................... 23

SUMMARY OF ARGUMENT ....................................................... 32

ARGUMENT ................................................................................. 37

I.      Standard of Review ......................................................... 37

II.     The District Court Did Not Abuse Its Discretion or
        Commit Clear Error in Approving the Settlements. ........... 39

        A.    The District Court Properly Exercised its Discretion in
              Finding the Settlements Satisfied Rule 23(e). ............... 39

              1.    The District Court Adequately Considered All
                    Factors Relevant to Rule 23(e). ......................... 40

              2.    The District Court Properly Considered
                    Whether the Settlements Equitably Treat Class
                    Members Who Both Bought and Sold Homes
                    Compared to Those Who Only Sold Homes. ...... 48

              3.    The Home Sellers Were Adequately
                    Represented, Including with Respect to Their

iv

Buyer-Side Claims. ............................................................54

B. The District Court Did Not Err in Denying Cheatham Objectors' Motion for Discovery...................................58

C. The District Court Did Not Violate Objectors-Appellants' Due Process Rights.....................................63

D. The District Court Properly Concluded that the Settlements Encompass the Related Indirect, Buyer-Side Claims that Arise from the Same Factual Predicate. ....................................................................69

    1. The District Court Properly Concluded That the Language of the Settlement Releases Encompasses the Home Sellers' Related, Buyer-Side Claims. ....................................................71

    2. The Court Did Not Abuse Its Discretion in Holding that a Home Seller's Buyer-Side Claims Involve the Same Factual Predicate.....................77

E. The District Court Properly Concluded that Claims Related to Non-NAR-Affiliated MLSs Like REBNY are Included in the Settlements. ......................................91

    1. The District Court Did Not Err in Articulating the Permissible Scope of a Settlement Release.................94

    2. The District Properly Applied the "Same Factual Predicate" Doctrine Here to Find That March's and Friedman's Claims Are Settled. .................100

        (1) March's And Friedman's Positions Are Foreclosed by the *Gibson* Complaint.......................101

        (2) The "Same Factual Predicate" Can Be Determined Without Resolving Contested Allegations. ...............................................103

    3. March's And Friedman's Positions Frustrate the Purposes of Settlement and Would Harm Class Members.................................................110

Appellate Case: 24-3478    Page: 6    Date Filed: 08/11/2025    Entry ID: 5546652

4. March's And Friedman's Own Complaints Allege Commonality Between Challenges to REBNY's and NAR's Rules. ...................115

5. Arguments Not Accepted by the JPML Do Not Change the Analysis. .....................................121

**CONCLUSION** ..................................................................... **125**

**CERTIFICATE OF SERVICE**........................................................ **130**

Appellate Case: 24-3478    Page: 7    Date Filed: 08/11/2025 Entry ID: 5546652

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. S. Farm Bureau Life Ins. Co.*,
   493 F.3d 1276 (11th Cir. 2007) ................................................. 106, 109

*Alexander v. Pathfinder, Inc.*,
   91 F.3d 59 (8th Cir. 1996) ..................................................................... 64

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997) ....................................................................... 56, 57

*Anderson v. Sherwin-Williams Co.*,
   No. ED CV 17-2459 FMO, 2020 WL 7051099 (C.D. Cal.
   May 12, 2020), *approval made final* 2020 WL 1354180
   (C.D. Cal. Oct. 23, 2020) .............................................................. 72, 73

*Batton v. Nat'l Ass'n of Realtors*,
   No. 21-cv-00430, 2024 WL 689989 (N.D. Ill. Feb. 20, 2024) ........ 86, 87

*Caligiuri v. Symantec Corp.*,
   855 F.3d 860 (8th Cir. 2017) .............................................................. 50

*Cleveland v. Whirlpool Corp.*,
   No. 20-cv-1906, 2022 WL 2256353 (D. Minn. June 23, 2022) ........... 47

*Cohen v. Brown Univ.*,
   16 F.4th 935 (1st Cir. 2021) .............................................................. 47

*Crum v. Vincent*,
   493 F.3d 988 (8th Cir. 2007) .............................................................. 83

*DeBoer v. Mellon Mortg. Co.*,
   64 F.3d 1171 (8th Cir. 1995) ........................................................... 113

Appellate Case: 24-3478   Page: 8   Date Filed: 08/11/2025 Entry ID: 5546652

*E.E.O.C. v. Milavetz & Assocs., P.A.*,
  863 F.2d 613 (8th Cir. 1988) ...........................................................125

*Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*,
  807 F. App'x 752 (10th Cir. 2020) ......................................................97

*Fager v. CenturyLink Commc'ns, LLC*,
  854 F.3d 1167 (10th Cir. 2016) ....................................................93, 94

*Fauley v. Metro. Life Ins. Co.*,
  52 N.E.3d 427 (Ill. App. Ct. 2016)....................................................3, 66

*Feed Mgmt. Sys., Inc. v. Comco Sys., Inc.*,
  823 F.3d 488 (8th Cir. 2016) .............................................................77

*Freeman v. MML Bay State Life Ins. Co.*,
  445 F. App'x 577 (3d Cir. 2011) .......................................................109

*Gustafson v. Cornelius Co.*,
  *724 F.2d 75 (8th Cir. 1983)* ................................................................7

*Healy v. Fox*,
  46 F.4th 739 (8th Cir. 2022)..............................................................83

*Hemphill v. San Diego Ass'n of Realtors, Inc.*,
  225 F.R.D. 616 (S.D. Cal. 2005) ........................................................62

*Herrera v. Charlotte School of Law, LLC*,
  818 F. App'x 165 (4th Cir. 2020)........................................................60

*Hesse v. Sprint Corp.*,
  598 F.3d 581 (9th Cir. 2010) ....................................................109, 110

*Howard v. Am. Online Inc.*,
  208 F.3d 741 (9th Cir. 2000) ...........................................................109

*Hufsmith v. Weaver*,
  817 F.2d 455 (8th Cir. 1987) .............................................................83

Appellate Case: 24-3478     Page: 9     Date Filed: 08/11/2025 Entry ID: 5546652

*Huyer v. Njema,*
    847 F.3d 934 (8th Cir. 2017) ............................................................ 40

*Huyer v. Wells Fargo & Co.,*
    314 F.R.D. 621 (S.D. Iowa 2016), *aff'd sub nom. Huyer v.*
    *Njema*, 847 F.3d 934 (8th Cir. 2017) ................................................ 70

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,*
    272 F. App'x 9 (2d Cir. 2008) ........................................................... 97

*In re Agent Orange Prod. Liab. Litig.*
    MDL No. 381, 818 F.2d 145 (2d Cir. 1987) ................................. 45, 54

*In re Blue Cross Blue Shield Antitrust Litig. MDL 2406,*
    85 F.4th 1070 (11th Cir. 2023) ......................................................... 49

*In re Cmty. Bank of Northern Virginia,*
    418 F.3d 277 (3d Cir. 2005) ............................................................. 61

*In re Corrugated Container Antitrust Litig.,*
    643 F.2d 195 (5th Cir. 1981) ............................................................ 98

*In re Currency Conversion Fee Antitrust Litig.,*
    264 F.R.D. 100 (S.D.N.Y. 2010) .................................................... 110

*In re Digit. Music Antitrust Litig.,*
    812 F. Supp. 2d 390 (S.D.N.Y. 2011) .......................................... 92, 99

*In re Equifax Inc. Customer Data Sec. Breach Litig.,*
    999 F.3d 1247 (11th Cir. 2021) .................................................... 55, 65

*In re Flint Water Cases,*
    63 F.4th 486 (6th Cir. 2023) .......................................................... 2, 60

*In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.,*
    357 F.3d 800 (8th Cir. 2004) .................................................... *passim*

Appellate Case: 24-3478    Page: 10    Date Filed: 08/11/2025   Entry ID: 5546652

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995)..................................................111

*In re Holocaust Victim Assets Litig.*,
  105 F. Supp. 2d 139 (E.D.N.Y. 2000)..................................42

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  205 F.R.D. 24 (D.D.C. 2001) ..................................2, 36, 62

*In re Namenda Direct Purchaser Antitrust Litig.*,
  462 F. Supp. 3d 307 (S.D.N.Y. 2020) ...........................45, 50

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  No. 20-CV-2394 (MKB), 2024 WL 4224160 (E.D.N.Y. 2024),
  *appeal docketed*, No. 24-2678 (2d Cir. Oct 9, 2024).........................73

*In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*,
  261 F.3d 355 (3d Cir. 2001).............................................108

*In re Prudential Ins. Co. Am. Sales. Pracs. Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998)...................................2, 60, 107

*In re T-Mobile Customer Data Sec. Breach Litig.*,
  111 F.4th 849 (8th Cir. 2024)...........................................3, 5

*In re Tyson Foods, Inc., Meat Processing Facilities Fair Labor Standards Act Litig.*,
  581 F. Supp. 2d 1374 (J.P.M.L. 2008) ..............................123

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*,
  716 F.3d 1057 (8th Cir. 2013) ...................................*passim*

*In re W. States Wholesale Nat. Gas Antitrust Litig.*,
  725 F. App'x 560 (9th Cir. 2018).....................................110

Appellate Case: 24-3478     Page: 11     Date Filed: 08/11/2025 Entry ID: 5546652

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
    396 F.3d 922 (8th Cir. 2005) .............................................. 1, 38, 39, 51

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
    644 F.3d 604 (8th Cir. 2011) ........................................................100

*Int'l Union, UAW v. Gen. Motors Corp.*,
    497 F.3d 615 (6th Cir. 2007) .................................................2, 43, 60

*Jones v. Int'l Paper Co.*,
    720 F.2d 496 (8th Cir. 1983) .....................................................42, 43

*Keil v. Lopez*,
    862 F.3d 685 (8th Cir. 2017) .....................................................38, 48

*Koehler v. Brody*,
    483 F.3d 590 (8th Cir. 2007) ........................................................122

*Lackawanna Chiropractic P.C. v. Tivity Health Support, LLC*,
    No. 18-CV-00649-LJV-JJM, 2019 WL 7195309 (W.D.N.Y.
    Aug. 29), *report & recommendation adopted by* 2019 WL
    7194525 (W.D.N.Y. Dec. 26, 2019).....................................................65

*Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*,
    921 F.2d 1371 (8th Cir. 1990) ....................................................41, 46

*Lutz v. HomeServices of America, Inc., et al*,
    No. 24-cv-10040, 2025 WL 2046905 (S.D. Fla. July 15,
    2025) ..................................................................................91

*Marshall v. Nat'l Football League*,
    787 F.3d 502 (8th Cir. 2015) .....................................................*passim*

*McDowell v. Safeway Stores, Inc.*,
    753 F.2d 716 (8th Cir. 1985) ...........................................................43

*Murphy v. Jones*, 877 F.2d 682 (8th Cir. 1989)...........................89, 90, 95

xi

Appellate Case: 24-3478    Page: 12    Date Filed: 08/11/2025 Entry ID: 5546652

*Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*,
    660 F.2d 9 (2d Cir. 1981)........................................................99

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) ......................................................56, 57

*Parrish v. Ball*,
    594 F.3d 993 (8th Cir. 2010) ............................................38

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) ..................................*passim*

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ...............................................3, 37, 67

*PHT Holding II LLC v. N. Am. Co. for Life & Health Ins.*,
    No. 4:18-cv-00368-SMR-HCA, 2023 WL 8522980 (S.D. Iowa
    Nov. 30, 2023)........................................................47

*Pollard v. Remington Arms Co.*,
    896 F.3d 900 (8th Cir. 2018) ............................................38

*Ponzio v. Pinon*,
    87 F.4th 487 (11th Cir. 2023)............................................47

*Qwest Commc'ns Corp. v. Free Conferencing Corp.*,
    920 F.3d 1203 (8th Cir. 2019) ........................................100

*Rescigno v. Statoil USA Onshore Props., Inc.*,
    Nos. 20-2431 & 23-1291, 2024 WL 4249491 (3d Cir. Sept.
    20, 2024) ..............................................................47

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
    442 F.3d 741 (9th Cir. 2006) ..........................................108

*Reynolds v. Nat'l Football League*,
    584 F.2d 280 (8th Cir. 1978) ............................................38

*Rhodes v. Olson Assocs., P.C.*,
   308 F.R.D. 664 (D. Colo. 2015) ............................................................65

*Robertson v. National Basketball Ass'n*,
   622 F.2d 34 (2d Cir. 1980) ..................................................................84

*S.E.C. v. Citigroup Glob. Mkts. Inc.*,
   673 F.3d 158 (2d Cir. 2012) ...............................................................103

*Sanderson v. Unilever Supply Chain, Inc.*,
   10-CV-00775-FJG, 2011 WL 5822413 (W.D. Mo. Nov. 16,
   2011) .................................................................................................46

*Schoffstall v. Henderson*,
   223 F.3d 818 (8th Cir. 2000) ...............................................................39

*Shelton v. Consumer Prods. Safety Comm'n*,
   277 F.3d 998 (8th Cir. 2002) ...............................................................38

*Spark v. MBNA Corp.*,
   48 F. App'x 385 (3d Cir. 2002) ......................................................3, 66

*Stallings v. Hussmann Corp.*,
   447 F.3d 1041 (8th Cir. 2006) ...........................................................122

*Stolicker v. Muller*,
   No. 1:04-CV-733, 2007 WL 9230595 (W.D. Mich. Apr. 10,
   2007) .................................................................................................65

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011) ................................................................72

*TBK Partners, Ltd. v. W. Union Corp.*,
   675 F.2d 456 (2d Cir. 1982) .........................................................*passim*

*Thompson v. Edward D. Jones & Co.*,
   992 F.2d 187 (8th Cir. 1993) .......................................................*passim*

Appellate Case: 24-3478     Page: 14     Date Filed: 08/11/2025 Entry ID: 5546652

*United States v. Anderson,*
  747 F.3d 51 (2d Cir. 2014) ................................................. 121

*United States v. Gehl,*
  128 F.4th 1001 (8th Cir. 2025) ........................................ 121

*Van Bronkhorst v. Safeco Corp.,*
  529 F.2d 943 (9th Cir. 1976) ............................................. 72

*Van Horn v. Trickey,*
  840 F.2d 604 (8th Cir. 1988) ................................... *passim*

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
  396 F.3d 96 (2d Cir. 2005) ...................................... *passim*

*West Alton Jones Foundation v. Chevron U.S.A. Inc.,*
  97 F.3d 29 (2d Cir. 1996) ................................................... 95

*Wilson v. Gen. Mortg. Co.,*
  638 S.W.2d 821 (Mo. App. 1982) .................................... 77

*Zutz v. Nelson,*
  601 F.3d 842 (8th Cir. 2010) .......................................... 95

## Statutes

28 U.S.C. § 1407 ............................................................... 123

## Rules

Fed. R. Civ. P. 23 ................................................... *passim*

## Constitutional Provisions

U.S. CONST. amend. V ......................................................... 3

## Other Authorities

2 McLaughlin on Class Actions § 6:23 (20th ed. Oct. 2023
  Update) ........................................................................... 45

xiv

6 Newberg & Rubenstein on Class Actions § 18:20 (6th ed.) ................42

7A Charles Alan Wright, Arthur R. Miller, and Mary Kay
    Kane, *Federal Practice & Procedure* § 1769 (2d ed.1986) .................58

Appellate Case: 24-3478    Page: 16    Date Filed: 08/11/2025 Entry ID: 5546652

# STATEMENT OF THE ISSUES

1. Whether the district court properly exercised its discretion in approving the settlements, each of which is fair, reasonable, and adequate and provides the class members with substantial monetary and injunctive relief, and which the district court approved only after carefully considering and addressing the merits of each objection?

Fed. R. Civ. P. 23(e)(2); *Marshall v. Nat'l Football League*, 787 F.3d 502 (8th Cir. 2015); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922 (8th Cir. 2005); *Van Horn v. Trickey*, 840 F.2d 604 (8th Cir. 1988).

2. Whether the district court properly exercised its discretion in finding that the class's home buyer claims shared the same factual predicate as the home seller claims, that the settlements treated all class members equitably, and that class member interests were adequately represented?

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057 (8th Cir. 2013); *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800 (8th Cir. 2004); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999).

1

3. Whether the district court properly exercised its discretion in finding that the claims in the New York actions shared the same factual predicate as the claims in the underlying actions, that the settlements treated all class members equitably, and that class member interests were adequately represented?

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057 (8th Cir. 2013); *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800 (8th Cir. 2004); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999).

4. Whether the district court properly exercised its discretion in denying Objector-Appellant Cheatham's discovery motion?

*In re Flint Water Cases*, 63 F.4th 486 (6th Cir. 2023); *Int'l Union, UAW v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007); *In re Prudential Ins. Co. Am. Sales. Pracs. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 24 (D.D.C. 2001).

5. Whether the district court violated the objectors' due process rights when it required their in-person attendance at the final settlement

2

hearing and noted that the objectors waived their objections due to non-attendance, but nevertheless overruled each objection after careful consideration on the merits in a detailed final settlement approval order?

U.S. CONST. amend. V; *Fauley v. Metro. Life Ins. Co.*, 52 N.E.3d 427 (Ill. App. Ct. 2016); *Spark v. MBNA Corp.*, 48 F. App'x 385, 391 (3d Cir. 2002); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985); *In re T-Mobile Customer Data Sec. Breach Litig.*, 111 F.4th 849 (8th Cir. 2024).

## INTRODUCTION

The law favors settlement to resolve claims fairly and efficiently. Here, thousands of satisfied class members, and ten appellees, risk having their compromise unwound simply because four objectors put their own interests ahead of the class interest in nationwide resolution. Plaintiff home sellers below alleged that the National Association of Realtors ("NAR") and Defendants-Appellees—various real estate brokerages—engaged in an antitrust conspiracy to inflate the commissions paid to real estate brokers. The district court approved a series of class action settlements to resolve these and all related claims, and it properly

3

exercised its discretion to do so. The settlements provide substantial monetary and injunctive relief to the class members, were negotiated at arm's length by experienced counsel via mediators, and are fair, reasonable, adequate, and equitable.

Objectors-Appellants, who could have opted out of the settlements but chose not to, now raise meritless arguments hoping to unwind nationwide settlements that ended years of contentious class action litigation. While Plaintiffs-Appellees raised their specific claims on behalf of home sellers, the Objectors-Appellants want to raise claims on behalf of home *buyers*—claims that the class settlement properly released because the conspiracy alleged in the complaint stems from the same factual predicate upon which both home seller and home buyer claims are based, namely that allegedly inflated broker commissions raise costs for both buyers and sellers. Likewise, Objectors-Appellants want to bring claims against the non-party Real Estate Board of New York ("REBNY"), but the settlements properly released those claims, which also rest on the same factual predicate as Plaintiffs' claims because Plaintiffs allege a nationwide conspiracy that impacts REBNY's practices challenged by

4

Objectors-Appellants in their copycat suits.

Unable to show their claims did not fall or should not have fallen within the scope of the class settlements' release provisions, Objectors-Appellants pivot to equally meritless procedural objections. The district court's order approving the class settlements at issue in this appeal should be affirmed in full.

## STATEMENT OF THE CASE

### I.    The Original Lawsuits

Objectors in this appeal ask this Court to take the extraordinary and drastic measure of unraveling the resolution of a long-running litigation alleging an antitrust conspiracy between NAR (the major trade association that represents real estate agents and brokers) and various real estate brokerage companies over the commissions paid during the sale of a home.

Back in 2019, a putative class of home sellers in Missouri sued NAR and the nation's four largest residential real estate brokerages—Anywhere Real Estate, HomeServices of America, Keller Williams Realty, and RE/MAX—arguing that certain NAR policies inflated the commissions the sellers paid to their real estate agents in connection with their home

5

sales. *See Burnett, et al. v. Nat'l Ass'n of Realtors, et al.*, No. 4:19-cv-332-SRB (W.D. Mo.) ("*Burnett*"). Copycat cases with similar allegations followed in other states. *See Moehrl v. Nat'l Ass'n of Realtors*, No. 1:19-cv-1610 (N.D. Ill.); *Nosalek v. MLS Prop. Info. Network, Inc.*, No. 1:20-cv-12244-PBS (D. Mass.). One of these cases included a substantially identical case that home *buyers* brought against the same set of defendants challenging the same alleged rules related to agent commissions. *See Batton v. Nat'l Ass'n of Realtors*, No. 1:21-cv-430 (N.D. Ill.) ("*Batton I*").[1]

All these cases centered on the same core theory: that NAR's agent commission policies, adopted and enforced by multiple listing services ("MLSs"), caused home sellers "to pay artificially inflated broker commissions when they sold their homes." Cheatham.App.10; R.Doc.161 at 10;[2] *see, e.g.*, Def.Ex.1, *Burnett*, No. 4:19-cv-332-SRB (W.D. Mo.), ECF

---

[1] In November 2023, a second *Batton* home buyer action was filed in the Northern District of Illinois that contained the same allegations as *Batton I* but against a different set of brokerage defendants. *See Batton, et al. v. Compass, Inc., et al.*, No. 1:23-cv-15618 (N.D. Ill.) ("*Batton II*"). Similar home buyer actions have been filed in other jurisdictions. Mullis.App.323; R.Doc.471-1 at ¶ 6 (citing *Davis v. Hanna Holdings, Inc.*, No. 24-cv-02374 (E.D. Pa.), and *Lutz v. HomeServices of America, Inc., et al*, No. 24-cv-10040 (S.D. Fla.)).

[2] All parallel R.Doc. citations identify the CM/ECF page number,

Appellate Case: 24-3478    Page: 22    Date Filed: 08/11/2025 Entry ID: 5546652

No. 759, Third Amended Complaint, ¶¶ 4-5, 8-10 (May 6, 2022).[3] Plaintiffs in the home buyer actions attempted to distinguish their copycat cases by arguing that these rules had the indirect effect of increasing home prices. *See* Def.Ex.2, *Batton I*, No. 1:21-cv-430 (N.D. Ill.), ECF No. 84, First Amended Complaint, ¶ 12 (July 6, 2022); Mullis.Br.5. The challenged policies in both sets of actions concern purported rules "requiring home sellers to make blanket unilateral offers of compensation to real estate brokers working with buyers," "allowing buyer agents to represent that their services are 'free,'" and "incentivizing and facilitating steering by brokers towards high commission listings and away from discounted listings." Cheatham.App.10; R.Doc.161 at 10.

---

irrespective of a document's internal pagination. All citations to Appellants' briefs, however, *do* use the internal page number.

[3] Citations to filings from the dockets in other cases are identified by their exhibit numbers ("Def.Ex.X") to Defendants-Appellees' Motion for Judicial Notice of Docket Entries in Related Cases. As explained therein, judicial notice is proper under Federal Rule of Evidence 201(b). All but three of these documents were previously judicially noticed by the district court and cited or discussed in the order appealed from. And the remainder are proper candidates for judicial notice "for the first time on appeal" because they do not expand the record with disputed facts and pose no thread of unfairness or surprise. *Gustafson v. Cornelius Co.*, 724 F.2d 75, 79 (8th Cir. 1983).

Appellate Case: 24-3478     Page: 23     Date Filed: 08/11/2025 Entry ID: 5546652

The original *Burnett* case proceeded through extensive discovery. *See* Cheatham.App.233-34; R.Doc.161-7 at ¶¶ 11-12. In August 2023, as the trial date approached, Anywhere Real Estate announced a settlement agreement in which it agreed to pay $83.5 million to the class and make a bevy of practice changes. Cheatham.App.12; R.Doc.161 at 12. In September 2023, RE/MAX agreed to pay $55 million into the settlement fund and make the same policy changes. *See id.* In October 2023, NAR, Keller Williams, and HomeServices proceeded to trial. The trial ended in a jury verdict in favor of plaintiffs totaling approximately $1.8 billion—a damages award that was subject to trebling under the antitrust laws. *See* Cheatham.Br.4; Cheatham.App.231-32; R.Doc.161-7 at ¶ 2. Thereafter, and because the parties were facing the risk of extended appeals and continued uncertainty, in February 2024, Keller Williams announced it had reached a settlement for $70 million. Cheatham.App.12; R.Doc.161 at 12. These settlement agreements ultimately received final approval by the district court, Cheatham.App.12; R.Doc.161 at 12, and are the subject of a separate set of consolidated appeals pending before this Court, *see Burnett, et al. v. Mullis*, No. 24-2143 (8th Cir.).

8

Eventually, in April 2024, the two remaining defendants in the initial lawsuit (NAR and HomeServices) settled as well—NAR for $418 million and HomeServices for $250 million. Cheatham.App.277; R.Doc.294 at 10. Those settlements also received final approval by the district court, and are the subject of a second, separate set of consolidated appeals pending before this Court. *See Burnett, et al. v. Mullis*, No. 24-3619 (8th Cir.).

## II.     The Copycat Lawsuits

The $1.8 billion *Burnett* jury verdict led to the filing of a slew of additional copycat lawsuits nationwide that contained materially identical allegations and were brought against smaller residential real estate brokerages. All told, more than a dozen such lawsuits have been filed across the country.

The first post-*Burnett* copycat lawsuit—this case now on appeal— was filed on October 31, 2023—the same day the *Burnett* jury rendered its verdict. *See Gibson, et al. v. Nat'l Ass'n of Realtors, et al.*, No. 4:23-cv-788-SRB (W.D. Mo.) ("*Gibson*"); Cheatham.App.805; R.Doc.522 at 7. The *Gibson* Plaintiffs were represented by the same firms that had litigated

9

*Burnett*; the case involved the same allegations of an alleged conspiracy around commission policies; and it was assigned to the same judge who oversaw *Burnett*, the Hon. Stephen Bough in the Western District of Missouri.

A couple of months later, these same law firms filed a second copycat suit, also in the Western District of Missouri, against more real estate brokerages. *See Umpa, et al. v. Nat'l Ass'n of Realtors, et al.*, No. 4:23-cv-945-SRB (W.D. Mo.) ("*Umpa*"). *Gibson* and *Umpa* were eventually consolidated in April 2024.[4] Defendants named in the consolidated *Gibson* class action complaint included NAR and the brokerages whose settlements are now the subject of this appeal: At World Properties, Compass, Douglas Elliman, Engel & Völkers, HomeSmart, Realty ONE, Redfin, The Real Brokerage, and United Real Estate.[5] These brokerages are collectively referred to as Defendants-Appellees.

---

[4] As a consequence, there are two different underlying dockets on this appeal. Citations to the "R.Doc" refer to the primary district court docket in *Gibson*. All references to *Gibson* refer to both the *Gibson* and *Umpa* actions unless otherwise noted.

[5] United Real Estate is the trade name for Defendant-Appellee Five D I, LLC; the two are not separate legal entities.

Appellate Case: 24-3478    Page: 26    Date Filed: 08/11/2025 Entry ID: 5546652

In late 2023, two separate actions were filed in federal district courts in New York challenging the policies of REBNY, a trade association that represents real estate agents in New York City. *See March v. Real Est. Bd. of N.Y., Inc.*, No. 1:23-cv-9995-JGLC-RWL (S.D.N.Y); *Friedman v. Real Est. Bd. Of N.Y., Inc.*, No. 1:24-cv-405-JGLC-RWL (S.D.N.Y). As even Objectors-Appellants acknowledge, these two cases involved "similar" conspiracies to those in *Burnett* and *Gibson* in that they "involve price fixing schemes through which real estate trade organization rules artificially inflate buyer-broker commissions." Friedman.Br.8. *Friedman* was originally filed in the Eastern District of New York but was voluntarily dismissed and re-filed in the Southern District of New York "with the intent of coordinating the litigation with the parallel *March* action." Friedman.Br.9. The only brokerage Defendants-Appellees in the *Friedman* and *March* actions who are appellees in this appeal are Compass, Douglas Elliman, and Engel & Völkers.[6] March and Friedman

---

[6] At World Properties' subsidiary, Christie's International Real Estate, LLC, is a named defendant in the *March* lawsuit and a released party under the At World Properties' settlement. March.Br.13-14. March objected to At World Properties' settlement.

Appellate Case: 24-3478    Page: 27    Date Filed: 08/11/2025 Entry ID: 5546652

have not objected to, and have not appealed, the settlements of the remaining Defendants-Appellees.

Among the dozen-plus copycat lawsuits filed in addition to *Gibson*, *Umpa*, *March*, and *Friedman* was one brought by four home sellers in South Carolina, including Benny Cheatham, *Burton v. Nat'l Ass'n of Realtors & Keller Williams*, No. 23-cv-5666 (D.S.C.).

### III. The Settlements Below

The $1.8 billion jury verdict in *Burnett* and the cascading settlements the *Burnett* plaintiffs reached with the nation's largest real estate brokerages materially changed the litigation calculus for each brokerage Defendant in the copycat *Gibson* and *Umpa* lawsuits. Each Defendant denied the allegations in the *Gibson* and *Umpa* complaints and had robust defenses to the claims. At the same time, Defendants were facing crippling liability should they proceed to trial and lose, as well as the prospect of protracted and expensive litigation and related business uncertainty in the interim.

Each Defendant-Appellee brokerage began to explore the possibility of early resolution. The arms-length settlement negotiations between

12

Plaintiffs-Appellees and each Defendant-Appellee were either aided by in-person mediation with an experienced antitrust expert and mediator or resulted from extensive direct negotiations over the course of several weeks. *See* Cheatham.App.14; R.Doc.161 at 14 (describing Compass, Real Brokerage, At Properties, Douglas Elliman, and Realty ONE settlement negotiations); Cheatham.App.279-80; R.Doc.294 at 12-13 (same for Redfin and Engel & Völkers); Cheatham.App.407-08; R.Doc.303-1 at ¶ 7 (same for United Real Estate and HomeSmart). Each negotiation accounted for the individual Defendant-Appellee's finances and ability to pay, as well as the risks, cost, and delay of further litigation—including likely and protracted appeals. *See* Cheatham.App.524-25; R.Doc.521 at 11-12.

On March 21, 2024, Compass reached a settlement with Plaintiffs. *See* Mullis.App.168-201; R.Doc.161-2 at 1-34. In exchange for a nationwide release of all claims, Compass agreed to pay $57.5 million into a settlement fund and to make significant practice changes. Mullis.App.176; R.Doc.161-2 at ¶ 18.

Settlements with the other Defendants-Appellees followed:

13

- On April 7, 2024, The Real Brokerage reached an agreement with Plaintiffs to settle all claims for $9.25 million. Cheatham.App.95; R.Doc.161-3 at ¶ 18.

- On April 23, 2024, Realty ONE reached an agreement with Plaintiffs to settle all claims for $5 million. Cheatham.App.127; R.Doc.161-4 at ¶ 18.

- On April 23, 2024, At World Properties reached an agreement with Plaintiffs to settle all claims for $6.5 million. Cheatham.App.167; R.Doc.161-5 at ¶ 18.

- On April 26, 2024, Douglas Elliman reached an agreement with Plaintiffs to settle all claims for $7.75 million in a guaranteed payment, and up to $10 million in contingent payments. Mullis.App.209; R.Doc.161-6 at ¶ 18.

- On June 26, 2024, Redfin reached an agreement with Plaintiffs to settle all claims for $9.25 million. Mullis.App.246; R.Doc.294-1 at ¶ 18.

14

- On July 11, 2024, United Real Estate reached an agreement with Plaintiffs to settle all claims for $3.75 million. Mullis.App.278-79; R.Doc.303-1 at ¶ 18.

- On July 12, 2024, Engel & Völkers reached an agreement with Plaintiffs to settle all claims for $6.9 million. Cheatham.App.355; R.Doc.294-1 at ¶ 18.

- On July 12, 2024, HomeSmart reached an agreement with Plaintiffs to settle all claims for $4.7 million. Cheatham.App.457-58; R.Doc.303-1 at ¶ 18.

All told, Defendants-Appellees contributed more than $110 million to the common settlement fund to the benefit of the class. Plaintiffs deferred setting an allocation plan for these funds, recognizing that, if additional brokerages settled, the total amount available to class members would increase.[7] The settlement agreements also made clear that Defendants-Appellees would have "no participatory or approval rights with respect to the Plan of Allocation" and the settlements would be

---

[7] The total settlement amount that is available to class members continues to rise beyond $110 million as Plaintiffs enter settlements with additional brokerages.

enforceable regardless of how the money was allocated. *See, e.g.*, Mullis.App.184; R.Doc.161-2 at ¶ 40.

In addition to these monetary terms, each Defendant-Appellee agreed to: (i) advise their agents that they are not required to make or accept offers of compensation or that, if made, such offers need not be universal, non-negotiable, and unilateral; (ii) require agents to conspicuously disclose to home buyers and sellers that agent commissions are negotiable; (iii) prohibit agents acting as home buyer representatives from representing that their services are free; (iv) require agents to disclose any offer of compensation at the earliest moment; (v) prohibit agents from using technology to restrict listings that are searchable by offers of compensation; (vi) show properties regardless of the level of commission being offered; and (vii) develop training for the points above.[8]

---

[8] *See* Cheatham.App.74-75; R.Doc.161-2 at ¶ 49 (Compass); Cheatham.App.107-09; R.Doc.161-3 at ¶ 49 (Real Brokerage); Cheatham.App.139-41; R.Doc.161-4 at ¶ 49 (Realty ONE); Cheatham.App.179-81; R.Doc.161-5 at ¶ 49 (At World Properties); Cheatham.App.215-17; R.Doc.161-6 at ¶ 49 (Douglas Elliman); Cheatham.App.333-35; R.Doc.294-1 at ¶ 49 (Redfin); Cheatham.App.367-69; R.Doc.294-1 at ¶ 49 (Engel & Völkers); Cheatham.App.433-35; R.Doc.303-1 at ¶ 49 (United Real Estate); Cheatham.App.469-71; R.Doc.303-1 at ¶ 49 (HomeSmart).

16

In exchange for these substantial monetary payments and industry-shifting practice changes, each of these settlement classes covered all persons nationwide who sold a home listed on any MLS in the United States and paid an agent commission.[9] Each of these settlements also released all claims class members may have had against each Defendant-Appellee arising out of "the same factual predicates," which necessarily included any claims a class member may have had as either a home *seller* or as a home *buyer*.[10] Thus, any individual who only bought a home during the class period is not included in these settlements.

---

[9] *See* Cheatham.App.61; R.Doc.161-2 at ¶ 15 (Compass); Cheatham.App.95; R.Doc.161-3 at ¶ 15 (Real Brokerage); Cheatham.App.127; R.Doc.161-4 at ¶ 15 (Realty ONE); Cheatham.App.167; R.Doc.161-5 at ¶ 15 (At World Properties); Cheatham.App.201; R.Doc.161-6 at ¶ 15 (Douglas Elliman); Cheatham.App.321-22; R.Doc.294-1 at ¶ 15 (Redfin); Cheatham.App.354; R.Doc.294-1 at ¶ 15 (Engel & Völkers); Cheatham.App.420; R.Doc.303-1 at ¶ 15 (United Real Estate); Cheatham.App.457; R.Doc.303-1 at ¶ 15 (HomeSmart).

[10] *See* Cheatham.App.59; R.Doc.161-2 at ¶ 11 (Compass); Cheatham.App.93; R.Doc.161-3 at ¶ 11 (Real Brokerage); Cheatham.App.125; R.Doc.161-4 at ¶ 11 (Realty ONE); Cheatham.App.165; R.Doc.161-5 at ¶ 11 (At World Properties); Cheatham.App.199; R.Doc.161-6 at ¶ 11 (Douglas Elliman); Cheatham.App.320; R.Doc.294-1 ¶ 11 (Redfin); Cheatham.App.352; R.Doc.294-1 at ¶ 11 (Engel & Völkers); Cheatham.App.418-19; R.Doc.303-1 at ¶ 11 (United Real Estate); Cheatham.App.455; R.Doc.303-1 at ¶ 11

Appellate Case: 24-3478     Page: 33     Date Filed: 08/11/2025 Entry ID: 5546652

The breadth of the release was critical to each Defendant-Appellee brokerage. Without the peace of mind that comes from global relief from all claims arising out of "the same factual predicates" as the underlying allegations, each Defendant-Appellee would not have agreed to settle while remaining subject to continued nationwide litigation. That is particularly true where the settlements were reached primarily based on each Defendant-Appellee's ability to pay. Put differently, without these terms forming part of the parties' bargain, class members would not have the benefit of the $110 million in monetary relief or practice changes. Instead, these individuals would be left to continue litigating these matters with uncertainty of their claims.

## IV.  The District Court Preliminarily Approved the Settlements

The district court preliminarily approved the settlements with Compass, Real Brokerage, Realty ONE, At World Properties, and Douglas Elliman on April 30, 2024; with Redfin and Engel & Völkers on July 15, 2024; and with United Real Estate and HomeSmart on July 16, 2024.

_____

(HomeSmart).

18

Cheatham.App.259-67, 390-98, 482-89; R.Doc.163, 297, 348. The district court found that each settlement was fair, reasonable, and adequate; that the class representatives had adequately represented the classes; that the agreements were the product of good faith and arms-length negotiations; that there had been adequate opportunity for discovery to evaluate the claims and risks of litigation; and that the district court would likely be able to approve each settlement under the terms of Federal Rule of Civil Procedure 23. *See, e.g.*, Cheatham.App.260; R.Doc.163 at ¶ 2.

The district court accordingly certified nationwide classes of home sellers who sold a home through an MLS and paid an agent commission during the relevant time period, finding that a nationwide class was warranted in light of the extensive discovery that had occurred into the alleged conspiracy and that a "nationwide settlement was a necessary condition of obtaining any settlement for the benefit of the class." *See* Cheatham.App.260-61, 262; R.Doc.163 at ¶¶ 3, 7. The district court expressly defined each settlement class, "[f]or the avoidance of doubt," as "a nationwide class with a nationwide settlement and release," including sellers who sold a home through a non-NAR MLS such as REBNY's

19

Residential Listing Service ("RLS"). Cheatham.App.261; R.Doc.163 at ¶ 3 & n.2; Cheatham.App.392; R.Doc.297 at ¶ 3; Cheatham.App.483; R.Doc.348 at ¶ 3.

Finally, the district court ordered broad notice to the class to coincide with the notice that was already in progress for the *Burnett* settlements, and set a deadline (October 3, 2024) for objections and opt-outs. *See* Cheatham.App.263-65; R.Doc.163 at ¶¶ 9, 11-13; Cheatham.App.659; R.Doc.521-3 at 69.

The notice was extensive: direct notice in the form of postcard and email notice went to some 13 million mail addresses and 25 million email addresses. Cheatham.App.529; R.Doc.521 at 16. The settlement administrator also implemented a comprehensive digital and electronic media notice program, including a press release and related press coverage. *Id.* Combined, the notice program reached at least 98% of the settlement class. *Id.*

The notice was also clear: it concisely described the case, the class definition, the time and manner for opting out or objecting, and how to submit a claim or obtain more information. *Id.* The notice stated on the

20

first page that the settlements were nationwide, reaching home sales "anywhere in the United States" and on any MLS "nationwide, regardless of whether they are affiliated with NAR or not" including sales through REBNY. Cheatham.App.658; R.Doc.521-3 at 68. The notice let class members know that the release covered all claims alleging that they "paid an excessive commission *or home price* due to the claims at issue" in the actions, making clear that the release included home buyer claims as well. Cheatham.App.664; R.Doc.521-3 at 74 (emphasis added).

In response to the class notice, 463,339 class members had submitted claims by the time of the district court's final fairness hearing. Cheatham.App.873-74; R.Doc.530 at ¶ 3. The claims period remained open until May 9, 2025, meaning additional claims were filed even after the district court granted final approval to the settlements. *Id.* In contrast, *only 46 class members* opted-out and there were *only eight objections*. Cheatham.App.874; R.Doc.530 at ¶ 4.

The eight objectors include the four Objectors-Appellants here:[11] Benny Cheatham, Robert Douglass, Douglas Fender, and Dena Fender

_____

[11] The district court also considered and overruled four *pro se* objections,

Appellate Case: 24-3478     Page: 37     Date Filed: 08/11/2025 Entry ID: 5546652

(hereinafter referred to as "Cheatham Objectors") on behalf of South
Carolina home sellers; Robert Friedman; Monty March; and James Mullis.
*See* Cheatham.App.490-97; R.Doc.464 (Cheatham Objectors);
Friedman.App.488-507; R.Doc.467 (Friedman); March.App.345-61;
R.Doc.470 (March); Mullis.App.308-21; R.Doc.471 (Mullis). Each is also a
named plaintiff in a copycat lawsuit that alleges essentially the same
claims as those alleged here. *See* Cheatham.App.895; R.Doc.530 at ¶ 43.
Specifically, Cheatham Objectors are plaintiffs in the *Burton* (South
Carolina) action challenging the same NAR policies. Friedman and March
are plaintiffs in the New York actions challenging the same policies of
REBNY. And Mullis is a named plaintiff in the *Batton* home buyers'
lawsuits, which challenge the same NAR policies.

In addition to lodging an objection to the settlements, Friedman filed
a reply in support of his objection, Friedman.App.1515-22; R.Doc.525, and
Cheatham Objectors filed a cursory motion for discovery, seeking
discovery into the Defendants-Appellees' financial records,

---

which are not at issue on appeal. *See* Cheatham.App.890; R.Doc.530 at
¶ 36.

Appellate Case: 24-3478     Page: 38     Date Filed: 08/11/2025 Entry ID: 5546652

Cheatham.App.501-03; R.Doc.465. The district court denied Cheatham Objectors' discovery request on the basis that objectors are generally not entitled to discovery. Cheatham.App.504; R.Doc.509.

On October 24, 2024, both Plaintiffs-Appellees and Defendants-Appellees moved for final approval of the settlements. Cheatham.App.514-75; R.Doc.521; Cheatham.App.799-838; R.Doc.522.

## V. The District Court Granted Final Approval of the Settlements

The district court held its final fairness hearing on October 31, 2024. *See* Cheatham.App.839-71; R.Doc.532. Prior to the hearing, the district court ordered all objectors to appear in person at the hearing. Cheatham.App.505; R.Doc.510. As the district court explained, this was in part due to the acts of a broker (not one of the objectors at issue in this appeal) engaging in harassing behavior against Judge Bough, resulting in the involvement of the U.S. Marshals. Cheatham.App.841-42; R.Doc.532 at 3-4. Three of the objectors on appeal (or their counsel) objected to the district court's order, explaining why objectors could not attend the final fairness hearing in person. *See* Compass.App.A13-A14; R.Doc.512-1 (Cheatham Objectors); March.App.964; R.Doc.519-1 (March);

23

Cheatham.App.506-13; R.Doc.520, 520-1, 520-2, 520-3 (Cheatham Objectors); Friedman.App.1509-14; R.Doc.524, 524-1, 524-2 (Friedman). Although the Objectors-Appellants themselves did not attend, their counsel were present and made arguments at the hearing and were asked substantive questions by the district court. Cheatham.App.889-90; R.Doc.530 at ¶ 35. After hearing from counsel for Plaintiffs-Appellees, Defendants-Appellees, and the Objectors-Appellants, the district court orally overruled the objections and approved the settlements. Cheatham.App.871; R.Doc.532 at 33.

On November 4, the district court followed up on its oral ruling in a thorough, 59-page opinion. *See* Cheatham.App.872-930; R.Doc.530, which is summarized below.

**Notice.** The district court found that the notice given to the settlement class was "extremely successful" and constituted the best notice practicable under the circumstances and fully satisfied Rule 23 and due process. Cheatham.App.873-74; R.Doc.530 at ¶¶ 2, 5. In contrast to the "massive scale" of the notice and the more than 463,000 claims submitted

there were only eight objections and 46 opt-outs. Cheatham.App.874; R.Doc.530 at ¶ 4.

**Rule 23 requirements.** The district court found that the prerequisites of Rule 23(a) and 23(b)(3) were met, including that common issues, such as whether any settling Defendant entered into any conspiracy, predominated over questions affecting only individual class members and that settlement on a class basis is the superior means to resolving the actions. Cheatham.App.876; R.Doc.530 at ¶¶ 11-12.

**Scope of release.** The district court, in response to objections below (arguments raised again on appeal), "specifically considered that the settlement class is nationwide and releases claims arising from sales of homes listed on NAR and non-NAR MLSs." Cheatham.App.877-78; R.Doc.530 at ¶ 15. The district court found this release proper because Plaintiffs in the amended complaint had pleaded a nationwide conspiracy on behalf of a nationwide class that challenged NAR policies, as well as those adopted by non-NAR entities like REBNY, with the same alleged anticompetitive effects. *Id.* The district court expressly found that certifying a nationwide class was warranted due to the existence of a

25

robust factual record to assess the claims, and because a nationwide settlement "was a necessary condition of obtaining any settlement for the benefit of the class." Cheatham.App.878; R.Doc.530 at ¶ 16.

**Settlement fairness.** Next, under Eighth Circuit precedent, the district court found that the settlements were fair, reasonable, and adequate. *See* Cheatham.App.879-88; R.Doc.530 at ¶¶ 18-32. The settlement class representatives and class counsel had adequately represented the class, the settlement negotiations were conducted at arm's length and after each settling Defendant had provided sufficient financial information for Plaintiffs to make an informed decision about settlement, the settlements provided for "significant financial recovery" to the class of at least $110 million, as well as substantial practice changes, and the settlements treat each class member fairly and equitably. *See id.* Finally, the "minimal" number of opt-outs and objections further supported a finding that the settlements were fair and reasonable. Cheatham.App.886-87; R.Doc.530 at ¶ 31.

**Objections.** Finally, in a discussion spanning 30 pages of its order, the district court carefully considered and overruled each of the objections.

26

Cheatham.App.888-918; R.Doc.530 at ¶¶ 33-87. The district court noted that the objectors waived their objections by failing to attend the final fairness hearing, as the district court's order required. Cheatham.App.889-90; R.Doc.530 at ¶ 35. Despite this, the district court—who had heard from Objectors-Appellants counsel at the final settlement hearing, Cheatham.App.847-67; R.Doc.532 at 9-29—*still considered the merits* of each objection in its order. Objectors-Appellants recognize this fact. *See, e.g.*, Mullis.Br.13 (stating that the district court's order "[a]ddress[ed] Mullis' objection"); March.Br.18 (admitting that the "district court, thereafter, overruled Mr. March's objections on the merits").

With respect to the four objections that constitute this appeal, the district court considered the merits as follows:

- <u>Cheatham Objectors</u>. The district court rejected an argument by Cheatham and the South Carolina objectors that the amount of recovery was too low, noting that a settlement has to be "fair, reasonable, and adequate" but not necessarily provide "complete relief" to the class nor, understandably, "exhaust all of a settling

27

defendant's financial resources." Cheatham.App.895-96; R.Doc.530 at ¶¶ 44-45. The district court also rejected an argument about the scope of the release reflected in the settlements, finding that the release—which extended to individual agents, affiliates, and franchisees of the Defendants-Appellees—was fair, reasonable, and adequate and bargained-for as part of the settlement process. Cheatham.App.897-98; R.Doc.530 at ¶¶ 47-48. Finally, the district court rejected an argument about the adequacy of the class notice, finding the notice was the best practicable under the circumstances and "sufficiently informed class members of their rights." Cheatham.App.898-901; R.Doc.530 at ¶¶ 49-53. The district court noted that, as of the date of its order, over 6,600 South Carolina residents had already submitted claims and would be at risk of not receiving any compensation should the district court not approve the settlements. Cheatham.App.901; R.Doc.530 at ¶ 54.

- <u>Friedman and March</u>. The district court also rejected the arguments made by the New York objectors, Friedman and March. Cheatham.App.901-06; R.Doc.530 at ¶¶ 55-67. The district court

found the New York objectors' argument that their cases are distinct from *Gibson* to be "unequivocally rebutted" by the plain language of the *Gibson* complaint, which pleaded a nationwide conspiracy that expressly challenged REBNY's rules. Cheatham.App.901-02; R.Doc.530 ¶ 56; *see* Friedman.App.320-21; R.Doc.232 at ¶ 182 (alleging that certain non-NAR MLSs including REBNY are controlled by NAR-aligned brokerages and are "generally subject to the same or similar anticompetitive restraints that apply in MLSs that are under NAR's formal control"). The district court also observed that the evidence adduced in *Burnett* reflected that the REBNY rules "were anticompetitive in similar ways to the challenged NAR rules" and that the challenged NAR rules "applied nationwide, including to transactions in REBNY." Cheatham.App.903-04; R.Doc.530 at ¶ 60. The district court also addressed arguments that the total settlement amount and practice changes were inadequate. Cheatham.App.905-06; R.Doc.530 at ¶¶ 63-66. Finally, the district court observed that more than 13,000 New York residents had submitted claims and would be at risk of not

receiving any compensation should the district court not approve the settlements. Cheatham.App.906; R.Doc.530 at ¶ 67.

- <u>Mullis</u>. The district court also addressed—and ultimately rejected—the arguments made by Mullis, the home-buyer plaintiff in the *Batton* lawsuits. Cheatham.App.906-18; R.Doc.530 at ¶¶ 68-87. The district court found that the settlement releases incorporated the Eighth Circuit's "same factual predicate" standard to preclude home-seller class members who also purchased homes during the class period from suing "for the same alleged antitrust conspiracy." The district court also determined that Defendants-Appellees "quite reasonably balked at paying large amounts in settlement only to have the same people they just paid sue them again for the same alleged antitrust conspiracy." Cheatham.App.906-07; R.Doc.530 at ¶ 68. This is key: because many home sellers also bought homes, a majority of class members had possible claims as both home sellers and home buyers. And yet the home seller Plaintiffs voluntarily agreed to relinquish ***their own*** home buyer claims in exchange for the extraordinary relief obtained in the settlements. The district

30

court made clear that this release just extended to the home sellers who comprised the class: individuals who only bought homes are not class members and could continue to litigate their "buyer only" claims. *See* Cheatham.App.914; R.Doc.530 at ¶ 82 ("The sole limitation imposed is that people who accept settlement benefits here cannot turn around and pursue a second recovery for the same conduct."). And if a class member did not want to release their home buyer claims, he or she could opt out and pursue their home seller and home buyer claims. Cheatham.App.907-08; R.Doc.530 at ¶ 70. Moreover, the district court properly stated that releasing buyer claims was part of the consideration for the settlement. Cheatham.App.909-10; R.Doc.530 at ¶ 73. The district court also rejected Mullis's argument that class representatives and class counsel provided inadequate representation to home buyers like himself, observing that all class members had the same objective of "ending Defendants' anticompetitive conspiracy and recovering the excessive commissions they paid as a result[.]" Cheatham.App.913-14; R.Doc.530 at ¶ 80. And the district court deemed "premature"

31

Mullis' objection to the plan of allocation, citing extensive authority for the proposition that court approval of a settlement is conceptually distinct from the approval of a proposed plan of allocation and noting that class members would receive notice and could object to the specific proposed allocations once such a plan is proposed. Cheatham.App.915-16; R.Doc.530 at ¶ 84.

After the district court approved the settlements, Cheatham Objectors filed a motion to reconsider, which the district court denied. Cheatham.App.931-32, 943; R.Doc.552, 559.

Each of these four objectors timely appealed. March.App.1057-59; R.Doc.558 (March); Mullis.App.597-99 R.Doc.561 (Mullis); Friedman.App.1615; R.Doc.563 (Friedman); Cheatham.App.944-45; R.Doc.587 (Cheatham Objectors). This Court consolidated briefing. Consolidated Appeal Briefing Schedule Order, Dkt. No. 5463973 (Dec. 6, 2024).

## SUMMARY OF ARGUMENT

Facing more than a dozen lawsuits across the country stemming from claims involving real estate agent commissions, as well as likely

protracted litigation, ongoing business uncertainty, and potentially crippling liability presaged by the approximately $1.8 billion *Burnett* verdict, each Defendant-Appellee entered into a settlement agreement resolving all claims with home sellers nationwide. The settlements contributed more than $110 million to the common settlement fund, in addition to nationwide practice changes that will benefit both home sellers and home buyers for years to come. The district court—which oversaw the predecessor *Burnett* lawsuit for a half-decade, including through a jury trial and multiple settlements with the original brokerage defendants, and which was intimately familiar with the facts and law of these cases—acted well within its broad discretion in approving each settlement now on appeal. The district court was right to reject Objectors-Appellants' objections below, and this Court should do the same now.

1. The district court did not abuse its discretion in finding that the settlements were fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e)(2). Contrary to Objectors-Appellants' contention, the district court did not rely on any presumption in favor of settlements. In fact, the district court explicitly stated it was not relying on any such presumption. Instead,

33

it carefully considered each of the required factors, including under Rule 23(e) and *Van Horn v. Trickey*, 840 F.2d 604 (8th Cir. 1988). Each settlement was negotiated at arm's length by experienced counsel and was either aided by in-person mediation with a skilled mediator or was the result of extensive direct negotiations between the parties over the course of several weeks. Each settlement provides class members with substantial monetary and injunctive relief, as evidenced in part by the near lack of opposition—a handful of opt-outs and objectors compared to hundreds of thousands of filed claims.

Objectors-Appellants' objections are meritless. The district court did not abuse its discretion in relying in part on proposed orders submitted by the parties given the complexity of the case and where the district court had a deep understanding of the facts and governing law and carefully considered and rejected each objection. Each Defendant-Appellee's ability to pay was scrutinized by experienced Plaintiffs' counsel prior to settlement, and there is no requirement for the district court to conduct its own forensic analysis. Nor is there any requirement that a settlement plan of allocation be enumerated in detail, or even determined, at the final

fairness stage. Objectors-Appellants have not identified a single "irrelevant factor" significantly influencing the district court's decision. *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015).

2. The district court did not abuse its discretion in finding that the class's potential home buyer claims and the claims in the New York actions are released by the settlements. Defendants required settling class members to release all the claims they personally held against these defendants that arose from the same allegedly inflated agent commissions. In exchange, Plaintiffs received substantial monetary and injunctive relief that will benefit both home sellers and home buyers nationwide. Plaintiffs are allowed to—and did—release all their claims arising out of the "same factual predicate"—here, the allegedly inflated price of real estate commissions. *See In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800, 805 (8th Cir. 2004) (hereinafter "*In re Gen. Am. Life*").

All class members received notice that the settlements would release home buyer claims in addition to home seller claims, and that the settlements were nationwide, reaching home sales "anywhere in the United States" and on any MLS "regardless of whether they are affiliated

35

with NAR or not" including sales through REBNY's RLS. Any class member who did not want to release the full scope of claims contemplated could have opted out of the settlements and pursued their claims separately.

Nor did the district court abuse its discretion in finding that the settlements treated all class members equitably and that class member interests were adequately represented.

3. The district court did not abuse its discretion in denying Cheatham Objectors' discovery motion seeking financial records. The purpose of discovery in the settlement context is to help the court determine whether a settlement is fair, reasonable, and adequate. *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 24, 26 (D.D.C. 2001). The district court had already considered the determinations as to each Defendant-Appellee's financial condition, so further discovery was unnecessary.

4. The district court did not violate the Objectors-Appellants' due process rights when it required their in-person attendance at the final settlement hearing. Due process requires that putative class members be

Appellate Case: 24-3478     Page: 52     Date Filed: 08/11/2025 Entry ID: 5546652

properly notified of the class action and that they must receive notice plus an opportunity to be heard and participate in the litigation in order to be bound by the judgment. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). All such requirements were satisfied here. Even if the district court erred by requiring the objectors' in-person attendance, such error was harmless because the district court considered Objectors-Appellants' written objections and their counsel's oral arguments at the fairness hearing and fully addressed each objection on the merits in its final approval order. Moreover, it is reasonable for a district court to require attendance at *any* hearing, especially the attendance of an objector at a final settlement approval hearing. It is especially reasonable to have done so here, after the district court faced harassing behavior by written communications in a related proceeding.

## ARGUMENT

### I. Standard of Review

The decision to approve a class settlement is "committed to the sound discretion of the trial judge," and "[g]reat weight is accorded his views because he is exposed to the litigants[] and their strategies, positions[,]

Appellate Case: 24-3478    Page: 53    Date Filed: 08/11/2025 Entry ID: 5546652

and proofs." *Reynolds v. Nat'l Football League*, 584 F.2d 280, 282-83 (8th Cir. 1978). "Only [a] clear showing that the district court abused its discretion" justifies setting aside a district court's settlement approval. *Id.* at 283; *accord In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005). And any findings of fact underlying the settlement approval are reviewed for clear error. *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010).

Accordingly, even if this Court concludes that the district court did not explain itself as well as it could have, the Court should affirm so long as "the record contains facts supporting the district court's approval of [a] settlement." *Keil v. Lopez*, 862 F.3d 685, 693 (8th Cir. 2017) (internal quotation marks omitted).

This Court also "appl[ies] an abuse of discretion standard to a district court's . . . determination that notice is the best practicable under Rule 23." *Pollard v. Remington Arms Co.*, 896 F.3d 900, 905-06 (8th Cir. 2018). While due process claims are reviewed de novo, *Shelton v. Consumer Prods. Safety Comm'n*, 277 F.3d 998, 1007 (8th Cir. 2002), objectors cannot escape the abuse-of-discretion standard by labeling a fairness objection as

38

a due process claim. Finally, this Court "review[s] the district court's discovery decisions for an abuse of discretion." *Schoffstall v. Henderson*, 223 F.3d 818, 822 (8th Cir. 2000).

## II. The District Court Did Not Abuse Its Discretion or Commit Clear Error in Approving the Settlements.

### A. The District Court Properly Exercised its Discretion in Finding the Settlements Satisfied Rule 23(e).

The district court properly exercised its discretion in approving the settlements under Rule 23(e). The standard for reviewing a class action settlement is whether it is "fair, reasonable, and adequate." *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013) (quoting Fed. R. Civ. P. 23(e)(2)) (enumerating factors). Because "a class action settlement is a private contract negotiated between the parties," the district court's "role in reviewing a negotiated class settlement is to 'ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned.'" *Marshall*, 787 F.3d at 509. The district court must also "serv[e] as a guardian of the rights of absent class members." *In re Wireless Tel.*, 396 F.3d at 932. Here, the district court did just that by properly

Appellate Case: 24-3478    Page: 55    Date Filed: 08/11/2025 Entry ID: 5546652

considering the Rule 23(e) factors, including the 2018 Amendments to Rule 23(e)(2) and the *Van Horn* factors.

### 1. The District Court Adequately Considered All Factors Relevant to Rule 23(e).

The district court properly considered the factors set forth in the 2018 Amendments to Rule 23(e)(2), including: (A) the adequacy of representation, Cheatham.App.872-930; R.Doc.530 at ¶ 22; (B) whether the settlements were negotiated at arm's length, *id.* at ¶ 23; (C) whether the relief provided is adequate, *id.* at ¶ 24; and (D) whether the settlements treat class members equitably relative to each other, *id.* at ¶ 27. The district court also properly considered the *Van Horn* factors, including: "the merits of the plaintiff's case, weighed against the terms of the settlement [*id.* at ¶ 28]; the defendant's financial condition [*id.* at ¶¶ 24, 73]; the complexity and expense of further litigation [*id.* at ¶¶ 25-26, 28, 30]; and the amount of opposition to the settlement [*id.* at ¶ 31]." *Huyer v. Njema*, 847 F.3d 934, 939 (8th Cir. 2017) (quoting *Van Horn*, 840 F.2d at 607).

"[M]indful of the limited scope of [its] review," this Court confines its analysis to determining "'whether the District Court considered all

40

relevant factors, whether it was significantly influenced by an irrelevant factor, and whether in weighing the factors it committed a clear error of judgment.'" *Marshall*, 787 F.3d at 508 (quoting *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 921 F.2d 1371, 1391 (8th Cir. 1990)). On appeal, Objectors-Appellants point to no "irrelevant factor" that significantly influenced the district court and have not identified any clear error of judgment. *Id.*

Objectors-Appellants claim that the district court "failed to exercise its fiduciary obligation to probe the merits of the proposed settlement[s]," Friedman.Br.14, and "accepted without contemplation" the proposed settlements, Cheatham.Br.i. Specifically, Objectors-Appellants claim that the district court "abdicated its responsibilities to absent class members" by accepting most of the language of the proposed order from the parties, Cheatham.Br.21, and failing to evaluate Defendants' financial conditions, Cheatham.Br.22; Friedman.Br.15. Further, Objectors-Appellants protest that the district court violated Rule 23 in that it did not give meaningful guidance as to how proceeds would be distributed. Friedman.Br.44.[12]

---

[12] Cheatham Objectors also raised the district court's release of

41

*First*, the district court did not abuse its discretion in relying in part on proposed orders submitted by the parties, and it is well supported by precedent in doing so. *Petrovic v. Amoco Oil Co.* found that "virtually verbatim adoption" of a proposed order does not change the standard of review, and that the district court's edits of certain sections (as it did here) indicated "more than just a cursory analysis and interpretation." 200 F.3d 1140, 1149-50 (8th Cir. 1999) (citing *Jones v. Int'l Paper Co.*, 720 F.2d 496,

---

franchisees: The district court approved the Released Parties, "which include Settling Defendants' franchisees and affiliated brokerages, and agents affiliated with those franchisees or affiliated brokerages." Cheatham.App.919-20; R.Doc.530 at ¶ 90. Only Cheatham Objectors take issue with the release of franchisees, arguing they have paid no money, and "will not have to change any of their conduct" and therefore get a "free ride." Cheatham.Br.23-26. Cheatham Objectors fail to recognize that Plaintiffs chose to address conduct remedies for brokers through settling with NAR and other MLSs directly, which has changed the allegedly anticompetitive rules. Plaintiffs also reasonably determined that it would be wasteful of settlement funds to sue separately all franchisees nationwide, rather than use franchisee liability as bargaining leverage over the franchisors to secure the lucrative settlements that are on appeal here. Further, "courts approve the release of non-parties, even those beyond their jurisdiction, so long as there exists some factual relationship between the release and the class's claims." 6 Newberg & Rubenstein on Class Actions § 18:20 (6th ed.). In making such a release, a settlement need not explicitly allocate separate consideration to those affiliates. *See In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 143, 160-63 (E.D.N.Y. 2000) (approving class settlement with broad releases including non-parties).

Appellate Case: 24-3478    Page: 58    Date Filed: 08/11/2025 Entry ID: 5546652

499 (8th Cir. 1983)). Here, the district court substantively edited the proposed order by including an analysis of its authority to require Objectors-Appellants to be present in person for the fairness hearing, Cheatham.App.889-90; R.Doc.530 at ¶¶ 35-36, and more details about certain objections, Cheatham.App.893-94; R.Doc.530 at ¶¶ 41-42, and by assessing the reasonableness of Plaintiffs' requested fees, Cheatham.App.928; R.Doc.530 at ¶ 108. Further, this Court has explained that "where the facts of a case are complex, 'practical considerations justify the judge's decision not to rewrite those findings which are accepted as proper[.]'" *Petrovic*, 200 F.3d at 1150 (quoting *McDowell v. Safeway Stores, Inc.*, 753 F.2d 716, 718 (8th Cir. 1985)).

*Second*, there is no obligation for the district court to conduct the elaborate financial analysis that Objectors-Appellants desire. *Int'l Union, UAW v. Gen. Motors Corp.*, 497 F.3d 615, 636 (6th Cir. 2007) ("[N]o court of appeals, to our knowledge, has demanded that district courts invariably conduct a full evidentiary hearing with live testimony and cross-examination before approving a settlement. Our Court, and several others, have instead deferred to the district court's traditionally broad discretion

43

over the evidence it considers when reviewing a proposed class action settlement."). Indeed, the district court specifically found that Plaintiffs and their forensic financial advisors fully analyzed Defendants-Appellees' finances and ability to pay prior to settling with them, as described in Part II.B, *infra*. Cheatham.App.881-82, 885, 896-97, 905-06; R.Doc.530 at ¶¶ 23-24, 29, 45-46, 63, 66.

*Third*, there is no requirement that the settlement plan of allocation be enumerated in detail, or even determined, at the final fairness stage. This Court rejects the notion that a court must provide to class members "a formula for calculating individual awards" when receiving notice; rather, a description of the "potential aggregate payout" is enough. *Petrovic*, 200 F.3d at 1153. Here, the long-form settlement notice provided to class members included the settlement amount (i.e., the potential aggregate payout) and a telephone number they could call for more information, like the notice approved in *Petrovic*. *See id.*; March.App.279-80; R.Doc.292-1 at 6-7.

The district court's approval of the settlements prior to an allocation decision was proper because "court approval of a settlement as fair,

44

reasonable and adequate is conceptually distinct from the approval of a proposed plan of allocation." 2 McLaughlin on Class Actions § 6:23 (20th ed. Oct. 2023 Update); *see also In re Agent Orange Prod. Liab. Litig.* MDL No. 381, 818 F.2d 145, 170 (2d Cir. 1987) ("The prime function of the district court in holding a hearing on the fairness of the settlement is to determine that the amount paid is commensurate with the value of the case. This can be done before a distribution scheme has been adopted so long as the distribution scheme does not affect the obligations of the defendants under the settlement agreement."). And "courts uniformly approve as equitable" plans in antitrust cases that "allocate[] funds among Class members on a pro rata basis," *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 316 (S.D.N.Y. 2020), as was the case here. Cheatham.App.912; R.Doc.530 at ¶ 78.

Finally, Objectors-Appellants complain that the district court failed to analyze the settlements under the 2018 Amendments to Rule 23(e)(2), arguing that the Amendment prohibits courts from applying a presumption of fairness. Mullis.Br.15. But this is based on the district court's citation of case law calling the settlements "presumptively valid"

45

or stating there was a "presumption in their favor." Cheatham.App.878-79; R.Doc.530 at ¶ 17.[13] The district court explicitly stated in its decision that it "*does not rely on any presumption* in favor of settlements here because these settlements need no presumption to be found fair, reasonable, and adequate." Cheatham.App.878-79; R.Doc.530 at ¶ 17 (emphasis added).

Moreover, this Court has never questioned the continuing validity of the presumptions of fairness from *Marshall* or *Uponor*. And other Circuits continue to apply a presumption,[14] as do the district courts of this

_____

[13] The Court cited *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*, 921 F.2d at 1383 (explaining that "[t]he law strongly favors settlements. Courts should hospitably receive them" and that "[t]his may be especially true in . . . a protracted, highly divisive, even bitter litigation"); *Petrovic*, 200 F.3d at 1148 ("A strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor."); *Marshall,* 787 F.3d at 508 ("A settlement agreement is 'presumptively valid.'") (*quoting Uponor*, 716 F.3d at 1063; and *Sanderson v. Unilever Supply Chain, Inc.*, 10-CV-00775-FJG, 2011 WL 5822413, at *3 (W.D. Mo. Nov. 16, 2011) (crediting the judgment of experienced class counsel that settlement was fair, reasonable, and adequate).

[14] *See, e.g., Rescigno v. Statoil USA Onshore Props., Inc.*, Nos. 20-2431 & 23-1291, 2024 WL 4249491, at *5 (3d Cir. Sept. 20, 2024) (applying a presumption in favor class action settlements); *Ponzio v. Pinon*, 87 F.4th 487, 493-94 (11th Cir. 2023) (same); *Cohen v. Brown Univ.*, 16 F.4th 935, 951 (1st Cir. 2021) (same).

Appellate Case: 24-3478    Page: 62    Date Filed: 08/11/2025 Entry ID: 5546652

Circuit.[15] The Court's citation to Eighth Circuit precedent from before the amendment thus does not signal an abuse of discretion.

Objectors-Appellants' other generalized arguments of inadequate analysis by the district court are belied by its detailed Order, based on its experience with the alleged conduct over years of litigation in these cases and the preceding *Burnett* litigation and trial. *See supra*, Part I. The district court analyzed the merits of the Plaintiffs' case, addressing each of the 2018 Amendments and *Van Horn* factors, as described above, and found "[t]he [s]ettlements provide a significant financial recovery to the Settlement Class in light of the strengths and weaknesses of the case and the risks and costs of continued litigation, including appeal, and the Settling Defendants' financial resources[, and] reflect a compromise based on the parties' educated assessments[.]" Cheatham.App.881-82; R.Doc.530

---

[15] *See, e.g., PHT Holding II LLC v. N. Am. Co. for Life & Health Ins.*, No. 4:18-cv-00368-SMR-HCA, 2023 WL 8522980, at \*3 (S.D. Iowa Nov. 30, 2023) ("The Eighth Circuit has held that the public policy favoring settlement agreements means 'courts should approach them with a presumption in their favor.'") (*quoting Petrovic*, 200 F.3d at 1148); *Cleveland v. Whirlpool Corp.*, No. 20-cv-1906 (WMW/JFD), 2022 WL 2256353, at \*4 (D. Minn. June 23, 2022) ("A class-action settlement agreement is 'presumptively valid.'") (*quoting Uponor*, 716 F.3d at 1063).

Appellate Case: 24-3478     Page: 63     Date Filed: 08/11/2025 Entry ID: 5546652

at ¶ 24. The settlements include both financial relief at the limit of Defendants-Appellees' ability to pay, and injunctive relief in the form of significant and sweeping nationwide practice changes to real estate transactions. Cheatham.App.883-84, 909-10, 912; R.Doc.530 at ¶¶ 27, 73, 78. The district court reasonably concluded that the settlements were in the best interests of all parties, bringing "substantial and immediate benefits on the class." *Keil*, 862 F.3d at 696.

The district court demonstrated its consideration of all the relevant factors. *Marshall*, 787 F.3d at 508. No "irrelevant factor" motivated the district court, and it did not commit any clear error of judgment. *Id.*

## 2. The District Court Properly Considered Whether the Settlements Equitably Treat Class Members Who Both Bought and Sold Homes Compared to Those Who Only Sold Homes.

In addition to the issues raised above, Mullis raised specific arguments related to the equitable treatment of class members. Rule 23(e)(2)(D) requires courts to make a finding that a proposed settlement is "fair, reasonable, and adequate" after considering whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Contrary to Mullis's arguments, the district court properly

48

considered this factor and did not abuse its discretion in finding the overall settlement met this standard.

The district court determined that the total amount of the settlement—at the limits of Defendants-Appellees' ability to pay—was commensurate with the value of the case, and treated class members equitably relative to each other. *See* Cheatham.App.881-82, 909-10; R.Doc.530 at ¶¶ 24, 73; *see In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1093 (11th Cir. 2023) (district court did not abuse discretion where "[i]t considered the differences between the self-funded claimants and the fully insured claimants like differing litigation risks, incurred costs, and claim strengths before concluding that the two were treated equitably"). As the district court explained, the settlement website advises that: (i) settlement payment "will take into account the amount of commissions class member claimants paid to a real estate broker or agent"; and (ii) "[t]o the extent the value of total claims exceeds the amount available for distribution from the settlement funds, each class member's share of the settlement may be reduced on a pro rata basis." Cheatham.App.883-84; R.Doc.530 at ¶ 27.

49

Mullis does not challenge the pro rata reductions, and for good reason, as such provisions are no barrier to a class action settlement approval. *See, e.g., Caligiuri v. Symantec Corp.*, 855 F.3d 860, 864-65 (8th Cir. 2017) (objection to consumer fraud settlement's pro rata reduction provision was "baseless"); *cf. In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d at 316 ("[C]ourts uniformly approve as equitable" plans in antitrust cases that "allocate[] funds among Class members on a *pro rata* basis.").

Rather, Mullis appears to take issue with *how* the allocation plan will "take into account the amount of commissions claimants paid." But Mullis's claim that a minority of class members who merely sold—but did not purchase—a home might receive a higher amount in the allocation phase (compared to those who both bought and sold homes) does not create an inequity among class members sufficient to unwind valuable settlements. Every person who meets the class definition is eligible to submit and receive pro rata compensation for a claim, and "'no allegation is made that the rights of a definable minority group within the class were sacrificed for the benefit of the majority.'" *See Van Horn*, 840 F.2d at 607

50

(citation omitted); *In re Wireless Tel.*, 396 F.3d at 933 (affirming settlement approval after acknowledging that "[t]he district court has a duty to the silent majority as well as the vocal minority"). Indeed, Mullis acknowledges that the majority of class members, like him, both sold and purchased homes. Mullis.Br.24.

Mullis argues that class members who both sold and purchased homes "will not receive adequate compensation" for their claims. *Id.* But this reasoning ignores "the way settlements usually work," as this Circuit has explained. *In re Gen. Am. Life*, 357 F.3d at 805. As the district court correctly concluded, the settlements properly limited the scope of the releases based on the "same factual predicate" standard (see Parts II.D and II.E, *infra*), and the parties were under no further obligation to assign separate settlement values to every distinct claim that class members might have asserted. Like Mullis, the *General American* plaintiff sought to void a class settlement release contending that "the class representative gave away all modal-billing claims (in the release) and received nothing in exchange for them." *Id.* This Circuit disagreed: although "no separately stated consideration was paid for [the modal-billing] claims," the release

of these claims "was one of a series of benefits conferred on the defendant" in exchange for benefits conferred on the class members "including a monetary settlement." *Id.* In other words, "[n]o part of the consideration on either side is keyed to any specific part of the consideration of the other." *Id.*

Here, Defendants-Appellees conceded valuable consideration for the settlements including broad injunctive relief and significant monetary relief—taking into account Defendants-Appellees' ability to pay. In exchange, the Plaintiffs-Appellees conferred valuable consideration on Defendants-Appellees in the form of a release for any claims arising under or relating to the same factual predicate, i.e., relating to the alleged anticompetitive rules at issue.

Mullis discounts the significance of the same factual predicate doctrine, asserting that "[w]hether or not the Defendants engaged in a single antitrust conspiracy has nothing to do with [the] allocation decision." Mullis.Br.25. But the injunctive relief targeting the allegedly anticompetitive conduct was also a significant part of the relief allocated to all class members. That relief was crafted to eliminate the business

52

practices alleged by both Mullis and settling Plaintiffs to comprise a conspiracy. It therefore applies equally to home seller and home buyer claims.

Just as it did in *General American*, this Circuit should decline to enmesh itself in trying to determine "the relative value" of a home seller's buyer-side claims—as compared to the seller-side claims—and instead defer to the judgment of the class representatives and class counsel that releasing all claims arising from the same factual predicate "was a proper thing to give up to obtain the benefits offered by [Defendants-Appellees]." *In re Gen. Am. Life*, 357 F.3d at 805.

To the extent that any of Mullis' objections go to the allocation of the settlements, these are different arguments, or are more properly addressed by opting out of the class. Regardless, such arguments are premature. "The prime function of the district court in holding a hearing on the fairness of the settlement is to determine that the amount paid is commensurate with the value of the case," which "can be done before a distribution scheme has been adopted so long as the distribution scheme does not affect the obligations of the defendants under the settlement

53

agreement." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d at 170. The district court therefore directed Plaintiffs-Appellees to submit for approval a proposed allocation plan for comment and review by class members. Cheatham.App.929; R.Doc.530 at ¶ 112. As the district court explained, "[a]ny Class members who disagree with the proposed allocations—e.g., because they believe that plan insufficiently compensates home purchases—will be able to present such argument to the Court" during the allocation phase. Cheatham.App.915-16; R.Doc.530 at ¶ 84. For these reasons, the district court fully considered whether the settlements treat class members equitably.

### 3. The Home Sellers Were Adequately Represented, Including with Respect to Their Buyer-Side Claims.

Mullis separately challenges the adequacy of representation of the home buyers, Mullis.Br.38-42, but the district court appropriately exercised its discretion to determine that class counsel and the class representatives adequately represented the class in full. Cheatham.App.880-81, 913-15; R.Doc.530 at ¶¶ 22, 80-83. Rule 23(e)(2)(A) requires courts to consider whether " the class representatives and class

54

counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). Mullis argues that class counsel preferred those with seller-side claims only, over those with both seller and buyer claims, but he fails to show a conflict between these groups such that those with both types of claims were not adequately represented. *See In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1277 (11th Cir. 2021) (finding no conflict and adequacy requirement satisfied where there was "no risk that any members of the class will have their ability to get settlement benefits reduced to zero because some other members got more relief from the settlement").

*First*, the class members are similarly situated, and their interests do not conflict. As the district court explained, the settlement covers only "people who sold homes during the class period," whose "interests are common and focused on achieving the greatest relief for the class." Cheatham.App.910-11; R.Doc.530 at ¶ 75. "[E]very Class member sold a home and therefore will receive compensation." *Id.* at 911; R.Doc.530 at ¶ 76. The court thus distinguished *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), which

55

involved "stark conflicts of interest" between injured class members and exposure-only class members, who "might develop asbestos-related injuries in the future." *Id.* (quoting *Petrovic*, 200 F.3d at 1146). Any differences in class members' relief from the settlements are simply a matter of allocation. These differences do not suggest that class members were not adequately represented.

Mullis contends the district court's arguments to distinguish *Amchem* and *Ortiz* are "contrary" to the Supreme Court's reasoning, Mullis.Br.41, but this Court has previously relied on the same reasoning as the district court in rejecting challenges regarding adequate representation under Rule 23. In *Petrovic*, this Court considered and upheld the approval of a class settlement for claims from pollution to property due to underground oil seepage from a petroleum refinery. 200 F.3d at 1140. The settlement class covered multiple geographic "zones" used to distribute the settlement funds, and objectors argued that the differently-positioned property owners in different zones had conflicting interests as a result. *Id.* at 1145. This Court affirmed the district court in rejecting that objection. Unlike in *Amchem* and *Ortiz*, this Court

56

explained, *Petrovic* "involve[d] a discrete and identified class that has suffered a harm the extent of which has largely been ascertained." *Id.* at 1146. And in any event, the *Petrovic* case had been vigorously litigated for years—unlike *Amchem* and *Ortiz*, where special attention was necessary because "the parties agreed upon a class definition and a settlement before formally initiating litigation." *Id.* at 1145.

Likewise, here, the settlements in question came about after extensive adversarial proceedings (in a related trial overseen by the same district judge concerning the same alleged conspiracy). And while the settlements will certainly "involve different awards for various class members," that alone does not create a conflict that would undermine the adequacy of representation. *Id.* at 1146.

*Second*, although Mullis insinuates that class counsel did not advocate for the home buyers' interests during settlement negotiations, *e.g.*, Mullis.Br.39, 42, he does not show that counsel's efforts for the class as a whole in any way undermined the home sellers' buyer-side relief. Class counsel need not separately act for each possible division within a class where the remedies sought are the same. "The interests of the

57

various plaintiffs do not have to be identical to the interests of every class member; it is enough that they 'share common objectives and legal or factual positions.'" *Petrovic*, 200 F.3d at 1148 (quoting 7A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice & Procedure* § 1769 at 367 (2d ed. 1986)). Just as class counsel would not need to advocate for sellers of homes in Des Moines as a separate group from those in Minneapolis, or those selling homes for more than $1 million separately from those selling homes for less, so too can they advocate for home sellers as well as home sellers that are also home buyers together, where the common objectives of the group in maximizing compensation and securing policy changes are consistent. Any differences in the amount of recovery between class members—which can exist in any class settlement—will be addressed in the allocation phase.

For all of the above reasons, the district court acted well within its discretion when it considered Rule 23 and approved the settlements.

### B. The District Court Did Not Err in Denying Cheatham Objectors' Motion for Discovery.

Cheatham Objectors claim that the district court abused its discretion in denying their requests for discovery of Defendants' financial

58

information. Cheatham.Br.26-28. On October 3, 2024, the same day that the settlement objections were due, Cheatham Objectors filed a motion for discovery. Cheatham.App.501-03; R.Doc.465. The motion sought to subpoena financial records of nine defendant groups (including entities not parties to this litigation) "for the purpose of evaluating the Objectors' positions regarding any continuing objection and further to help provide the court with valuable evidence in ruling on whether to grant final approval of the proposed settlement[s]." Cheatham.App.501-02; R.Doc.465 at 1-2.

Defendants opposed, citing Plaintiffs' counsel's declarations, which stated that in coming to agreement on the settlements' amounts, "Plaintiffs received and carefully reviewed detailed financial records from each of the Defendants, including analysis by one of Plaintiffs' counsel [a CPA trained in forensic accounting] . . . The monetary settlements were reached with due consideration for the Defendants' ability to pay a judgment or settlement." Compass.App.A2-A3; R.Doc.508 at 2-3. Nothing in Objectors-Appellants' "barebones" and untimely motion for discovery of "financial records" demonstrated why Cheatham Objectors would be

59

entitled to discovery. *Id.*

After examining the facts and the timing, the district court properly denied the motion for discovery, stating that "courts are unanimous that objectors are generally not entitled to discovery." Cheatham.App.504; R.Doc.509. The district court relied on (i) *International Union, UAW*, which found that "objecting class members are not automatically entitled to discovery" and instead "only if the objectors make a colorable claim that the settlement should not be approved," 497 F.3d at 637; (ii) *In re Prudential Insurance Co. America Sales Practices Litigation Agent Actions*, which found that the district court acted within its discretion in denying discovery to an objector, *see* 148 F.3d 283, 325 (3d Cir. 1998); (iii) *In re Flint Water Cases*, 63 F.4th 486, 499-501, 507-09 (6th Cir. 2023), which similarly denied discovery; and (iv) *Herrera v. Charlotte School of Law, LLC*, which found no abuse of discretion in applying a stringent standard to settlement-related discovery and denying discovery to an objector, *see* 818 F. App'x 165, 178-79 (4th Cir. 2020). Cheatham.App.504; R.Doc.509.

In support of their position, Cheatham Objectors cite *In re*

*Community Bank of Northern Virginia* for the proposition that the refusal of the settling parties to provide access to discovery information is a reason supporting objector discovery. 418 F.3d 277, 316 (3d Cir. 2005); Cheatham.Br.28. However, that case involved requests for discovery into a settlement in a separate, related case, in order to demonstrate that the present settlement was inadequate. *Id.* Even there—under circumstances irrelevant to Cheatham Objectors' discovery request in this case—the Third Circuit noted that it was "inclined to agree with the settling parties that the District Court's Order limiting discovery was not an abuse of discretion" but commented that it was "unable to conclusively so hold" because the record contained no details of the related matter from which the information was sought. *Id.* at 317.

As Cheatham Objectors recognize, the standard of review for a denial of an objector's request for discovery is one of abuse of discretion. A court "may in its discretion allow discovery if it will help the Court determine whether the settlement is fair, reasonable, and adequate." *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. at 26. "The fundamental question is whether the district judge has sufficient facts

before him to intelligently approve or disapprove the settlement."
*Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 619-20 (S.D. Cal. 2005).

The district court did not err in concluding that it had sufficient facts—namely, attestations by Plaintiffs' forensic financial advisors that Defendants' finances had been examined closely during adversarial settlement negotiations—to determine whether the settlements were fair, reasonable, and adequate. There is simply no requirement for a district court to conduct a searching financial review of each settling defendant prior to approving a settlement. Objectors-Appellants have no basis to suggest that the "financial statements" of parties (and non-parties) to the settlements would have uncovered something that the district court did not already consider. Moreover, Objectors-Appellants sought financial data that was not supplied in discovery, but rather, was supplied in the context of confidential settlement negotiations and protected by confidentiality agreements between the negotiating parties. Cheatham.App.501-03; R.Doc.465. Objectors-Appellants are not parties to these confidentiality agreements, and they are not entitled to any such

information under them. The district court's discovery ruling was a proper exercise of its discretion.

## C. The District Court Did Not Violate Objectors-Appellants' Due Process Rights.

Objectors-Appellants claim that the district court violated due process in requiring their appearance at the Final Fairness Hearing, Cheatham.App.505; R.Doc.510, and waiving their objections when they chose not to appear, Mullis.Br.46; March.Br.21; Cheatham.Br.10; Friedman.Br.46. Objectors-Appellants' argument is meritless.

Despite the district court's brief notation of waiver,[16] *the district court fully addressed the objections on the merits in its Final Approval Order.* Cheatham.App.895-918; R.Doc.530 at ¶¶ 43-87. Thereafter, the district court further confirmed in a later order: "[T]he Court nonetheless fully considered their objections and overruled them on the merits." Cheatham.App.943; R.Doc.559. March and Mullis concede this point. March.Br.18 ("The District Court, thereafter, overruled Mr. March's

---

[16] Cheatham.App.889-90; R.Doc.530 at ¶ 35 ("[A]ll objections filed by the above named Objectors who did not appear in person at the October 31, 2024, Final Settlement Hearing, are waived for failing to comply with the Court's order.").

Appellate Case: 24-3478    Page: 79    Date Filed: 08/11/2025 Entry ID: 5546652

objections *on the merits*. [citing the district court's Final Approval Order]")
(emphasis added); Mullis.Br.13 ("[The district court] also determined that
Mullis and other objectors had waived their objection by failing to appear
in person at the fairness hearing. *Addressing Mullis' objection . . .*")
(emphasis added). Noting that an argument is waived, then addressing it
in full is, at most, harmless error. *Cf. Alexander v. Pathfinder, Inc.*, 91 F.3d
59, 63 (8th Cir. 1996) (finding harmless error when the district court
reviewed materials outside the pleadings at the motion to dismiss stage
because appellant was able to respond to the contemplated dismissal,
among other reasons).

   To support their contrary position, Objectors-Appellants cite to cases
that indicate that in certain circumstances, other courts have not required
in-person attendance. However, Objectors-Appellants' reliance on these
cases is misguided. While these cases do not require objectors to appear in
person to object, none of the cited cases hold that it is a failure of Rule 23
or due process if a court does require objectors to attend the final approval
hearing. *See Rhodes v. Olson Assocs., P.C.*, 308 F.R.D. 664, 668 (D. Colo.
2015), *Lackawanna Chiropractic P.C. v. Tivity Health Support, LLC*, No.

Appellate Case: 24-3478     Page: 80     Date Filed: 08/11/2025 Entry ID: 5546652

18-CV-00649-LJV-JJM, 2019 WL 7195309, at *5 (W.D.N.Y. Aug. 29), *report & recommendation adopted by* 2019 WL 7194525 (W.D.N.Y. Dec. 26, 2019), *Stolicker v. Muller*, No. 1:04-CV-733, 2007 WL 9230595, at *4 (W.D. Mich. Apr. 10, 2007).

Objectors-Appellants do not argue that they were given too little time or opportunity to raise their objections, but rather, that they were required to do too much, i.e., appear at a hearing. Mullis.Br.46; March.Br.21; Cheatham.Br.10; Friedman.Br.46. But courts can go even further to require objectors to sit for depositions. *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1266-67 (11th Cir. 2021) (explaining that "depositions are a normal part of litigation . . . including for objectors to class settlements" and collecting cases that support the same). *See also*, *In re T-Mobile Customer Data Sec. Breach Litig.*, 111 F.4th 849 (8th Cir. 2024) (favorably citing *Equifax*, and suggesting it is proper to require a deposition of an objector).

It is thus reasonable and within the district court's discretion to require the much less burdensome act of attendance at a hearing. *See Fauley v. Metro. Life Ins. Co.*, 52 N.E.3d 427, 438-39 (Ill. App. Ct. 2016)

65

(finding no due process violation for requiring class members to be present in court to object). In *Fauley*, the court held that "requiring class members to be present in court to object did not violate their due-process rights." 52 N.E.3d at 438-39. March argues that *Fauley* is inapposite because the requirement there was provided in the class notice; but the court paid no mind to the location of the requirement in finding the requirement to appear did not violate objectors' due process rights. March.Br.29-30. *Fauley* in turn found persuasion from the Third Circuit. 52 N.E.3d at 438-39 (citing *Spark v. MBNA Corp.*, 48 F. App'x 385, 391 (3d Cir. 2002)) ("[W]e are confident that a court, consistent with due process, may require an objector to be present, *in person or* by counsel, to present his objections and respond to inquiries.") (emphasis added). Importantly, in this case, the district court had legitimate reasons to require the in-person appearance of objectors after the court faced harassing behavior by written communications from a real estate broker in related proceedings.[17] *See* March.Br.25, n.9.

---

[17] There is no evidence the district court was motivated by "animus" toward all objectors to settlements, as Cheatham Objectors claim. Cheatham.Br.13, 19.

Appellate Case: 24-3478     Page: 82     Date Filed: 08/11/2025 Entry ID: 5546652

As Objectors-Appellants note, Rule 23 and due process require that putative class members be properly notified of the class action and that they must receive notice plus an opportunity to be heard and participate in the litigation in order to be bound by the judgment. *Phillips Petroleum Co.*, 472 U.S. at 812. Cheatham.Br.10-11. The settlement approval process met these requirements: Objectors-Appellants received notice, not only of the settlements, but also of the obligation to appear in person. Each acknowledge that they received notice of the district court's in-person attendance requirement, with all but Mullis contacting the district court prior to the hearing acknowledging the obligation, with most seeking to "request" relief from this obligation, thereby recognizing the district court's ability to grant or deny such a request. Compass.App.A13-A14; R.Doc.512-1 (Cheatham Objectors); March.App.964; R.Doc.519-1 (March); Cheatham.App.506-13; R.Doc.520 (Cheatham Objectors); Friedman.App.1509-14; R.Doc.524, 524-1, 524-2 (Friedman). None sought a continuance of the hearing. *See id.*

Further, March's objections that potential class members did not receive notice of such an obligation is illogical, as the obligation applied to

67

objectors only, and the objection deadline had passed at that point, defining and limiting the set of objectors—with each Objector-Appellant represented by counsel with access to the docket—to whom the requirement applied. Similarly, March's argument that the order "necessitat[ed] all putative class members' personal attendance" is incorrect. March.Br.20. The court's order only required the in-person attendance of *objectors*. Cheatham.App.505; R.Doc.510.

Objectors-Appellants also received an opportunity to be heard. Objectors-Appellants submitted fulsome arguments through their timely written objections,[18] with Friedman submitting further Reply materials, Friedman.App.1515-22; R.Doc.525. And counsel who attended the Final Fairness Hearing on behalf of Objectors-Appellants were given the opportunity to make substantive arguments, *see e.g.*, Friedman.Br.11 (explaining that at the hearing his counsel "highlighted key distinctions of the REBNY and NAR conspiracies, noted deficiencies and limitations in the Appellees' submissions, and referred the court to arguments made in

---

[18] *See* Cheatham.App.490-97; R.Doc.464; Friedman.App.488-507; R.Doc.467; March.App.345-61; R.Doc.470; Mullis.App.308-21; R.Doc.471.

Appellate Case: 24-3478     Page: 84     Date Filed: 08/11/2025 Entry ID: 5546652

Friedman's reply"); Cheatham.App.847-867; R.Doc.532 at 9:22-29:8.

For these reasons, Objectors-Appellants had a full and fair opportunity to present their arguments to the district court, and the district court considered and rejected each objection; Rule 23(e) and due process require nothing more.

**D. The District Court Properly Concluded that the Settlements Encompass the Related Indirect, Buyer-Side Claims that Arise from the Same Factual Predicate.**

In agreeing to settle these suits, Defendants-Appellees sought to resolve all claims that arose from "the same factual predicate." This intent is reflected in the plain language of the settlement agreements and what the district court approved under Eighth Circuit precedent.

Under established precedent, a settlement may release claims so long as they "arise out of the same factual predicate." *Uponor*, 716 F.3d at 1065 (rejecting an objection that "the settlement contained an overbroad release" and finding that the settlement permissibly released all claims "[]related to leaky brass fittings"). A release is consistent with due process, regardless of its breadth, where it encompasses claims that arise out of or relate to the same facts underlying the plaintiffs' claims. *See Thompson,*

69

992 F.2d at 190-91 (affirming district court's approval of settlement that released claims that could have been but were not brought and finding that "the situation is analogous to the barring of claims [under res judicata] that could have been asserted in the class action") (quoting *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982)); *Huyer v. Wells Fargo & Co.,* 314 F.R.D. 621, 628 (S.D. Iowa 2016) (release was "not overly broad" because it was "only applicable to claims 'arising out of, or relating to'" the factual predicate giving rise to the plaintiffs' claims), *aff'd sub nom. Huyer v. Njema*, 847 F.3d 934 (8th Cir. 2017).

Mullis, who both bought and sold a home during the class period, attempts to bust open the settlements—which have amassed at least a $110.6 million recovery, Cheatham.App.882-83; R.Doc.530 at ¶ 25—by cleaving the single alleged conspiracy into two: one against home sellers and one against home buyers. But this makes no sense. Settling Plaintiffs alleged that various NAR (and non-NAR entities') rules inflated commissions for buyer brokers and seller brokers through anticompetitive restraints. Whether the allegedly inflated commissions resulted directly from selling a home or from selling *and* buying a home, the alleged harm

70

emanates from what Mullis concedes are the *same commission rules* and *same alleged conspiracy*. The only distinction is whether the damages are direct or indirect. For any transaction where Mullis asserts a buy-side claim based on indirect damages, *Gibson* asserts a sell-side claim based on direct damages. To the extent members of the *Gibson* class have both buy-side and sell-side claims, they agreed to release them all in exchange for the settlement payments.

Contrary to Mullis's contentions, the settlements agreed to by the class and approved by the district court properly resolve all claims arising out of that same factual predicate. The plain language of the settlement agreements expressly releases claims arising from "any or all of the same factual predicates for the claims alleged in the Actions," and therefore releases Mullis's home seller and home buyer claims against Defendants-Appellees. Furthermore, the district court properly determined that the buyer-side claims of home sellers were properly released because they share the same factual predicate under Eighth Circuit precedent.

> **1.** **The District Court Properly Concluded That the Language of the Settlement Releases Encompasses the Home Sellers' Related, Buyer-Side Claims.**

The district court properly enjoined Mullis's home buyer claims because the settlements at issue expressly encompass related nationwide claims brought by home sellers who were also home buyers.

As a practical matter, Defendants-Appellees would not have settled *Gibson* without a nationwide release for all the related claims of the class, including their home buyer claims—which is why the release incorporated these principles. Defendants-Appellees were motivated to settle based on their ability to pay in order to buy global peace. *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 311 (3d Cir. 2011) ("[A]chieving global peace is a valid, and valuable, incentive to class action settlements."); *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976) (acknowledging "there is an overriding public interest in settling and quieting litigation" and that this is "particularly true in class action suits"); *Anderson v. Sherwin-Williams Co.*, No. ED CV 17-2459 FMO (SHKx), 2020 WL 7051099, at *10 (C.D. Cal. May 12, 2020) (preliminarily approving settlement and recognizing "defendant's business interest in ending this litigation"), *approval made final*, 2020 WL 1354180 (C.D. Cal. Oct. 23, 2020). This Court has recognized that a broad release may be "an integral part of the

72

settlement bargain entered into for [the parties]," and therefore "this Court cannot now modify the terms of that bargain at the insistence of one class member." *Thompson v. Edward D. Jones & Co.*, 992 F.2d 187, 190 n.5 (8th Cir. 1993).

Indeed, if the Court were to agree with Mullis that a home seller's buyer-side claims were not released by the settlements, "any Class Member bound by the release" in a direct purchaser settlement could turn around and "file a new lawsuit asserting indirect purchaser claims under state law" against the same settling defendant arising out of the same facts. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 20-CV-2394 (MKB), 2024 WL 4224160, at *15 n.16 (E.D.N.Y. 2024), *appeal docketed*, No. 24-2678 (2d Cir. Oct 9, 2024).

But that is not the law, for good reason. "Such a result would permit potentially duplicative recovery for class members and would undermine the 'ability of a defendant to achieve "global peace" by obtaining releases from those who might wish to assert claims, meritorious or not.'" *Id.* It logically follows that Defendants-Appellees found partial releases intolerable when negotiating settlement amounts based on ability to pay

73

and why Plaintiffs agreed to full releases. Much like any reasonable settling defendant in a class action, Defendants-Appellees would not be willing to pay large amounts in settlement only to have members of the settlement class bring another action against them for the same alleged antitrust conspiracy.

For this reason, the plain language of the releases unambiguously conveys the parties' agreements to release all claims because it covers "any and all manner of federal and state claims regardless of the cause of action arising from or relating to conduct that was *alleged or could have been alleged* in the Actions based on *any or all of the same factual predicates* for the claims alleged in the Actions,[19] including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with *the sale of any residential home*." Cheatham.App.59; R.Doc.161-2 at 6; Cheatham.App.66-67; R.Doc.161-2 at 13-14 (emphases added); Cheatham.App.93, 101; R.Doc.161-3 at 6, 14; Cheatham.App.125,133; R.Doc.161-4 at 6, 14; Cheatham.App.165, 173;

---

[19] "Actions" refers to *Gibson, et al. v. Nat'l Ass'n of Realtors, et al.*, No. 4:23-cv-788-SRB (W.D. Mo.) and *Umpa, et al. v. Nat'l Ass'n of Realtors, et al.*, No. 4:23-cv-945-SRB (W.D. Mo.). Mullis.App.171; R.Doc.161-2 at 4.

Appellate Case: 24-3478     Page: 90     Date Filed: 08/11/2025 Entry ID: 5546652

R.Doc.161-5 at 6, 14; Cheatham.App.199, 207; R.Doc.161-6 at 6, 14. Consequently, claims based on inflated home prices—regardless of which class members bring the claim—are covered by the plain language of the release.

In addition to the general release for Defendants, the settlement release expressly extends to claims against third-party brokers and agents for paying "an excessive . . . home price." That release states that it does "not extend to any individual claims that a class member may have against his or her own broker or agent based on" certain specified conduct, "*other than a claim that a class member paid an excessive commission or home price due to the claims at issue in these Actions*." Cheatham.App.59; R.Doc.161-2 at 6, Cheatham.App.66-67; R.Doc.161-2 at 13-14 (emphases added); Cheatham.App.93, 101; R.Doc.161-3 at 6, 14; Cheatham.App.125, 133; R.Doc.161-4 at 6, 14; Cheatham.App.165, 173; R.Doc.161-5 at 6, 14; Cheatham.App.199, 207; R.Doc.161-6 at 6, 14. In other words, the release explicitly releases a class member's claims that he or she paid an excessive home price as a buyer due to the claims at issue, even against the class member's own broker or agent, while reserving the right to pursue certain

75

claims against the class members' own broker or agent (breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim).

Mullis argues that the language only extinguishes such excessive-price claims against third-party brokers, not Defendants-Appellees. Mullis.Br.45. Under his contrived reading, Mullis contends that the parties chose not to extinguish such claims against Defendants-Appellees "out of fear of creating an unenforceable contract term." This purported rationale proves too much: Mullis does not explain why the parties would nonetheless expressly extinguish those claims against only third-party brokers, to which Mullis's reasoning would equally apply. *Id.* The more natural reading makes clear that the release for third-party brokers mirrored the release of claims against Defendants-Appellees, except for tort claims.

The Court should affirm the district court's reading of the parties' intent expressed in their negotiated release. The release's plain language "clearly and unambiguously" states that it covers all claims arising from or relating to conduct that was alleged or could have been alleged in the Actions, and that language is controlling. *Wilson v. Gen. Mortg. Co.*, 638

76

S.W.2d 821, 823 (Mo. App. 1982); *see also In re Gen. Am. Life*, 357 F.3d at

803-05 (having "no difficulty in concluding" that similarly "broad" release

"clearly encompassed" "all" related claims); *Thompson*, 992 F.2d at 190-91

(same). The breadth of the release does not change this analysis. *See Feed*

*Mgmt. Sys., Inc. v. Comco Sys., Inc.*, 823 F.3d 488, 494 (8th Cir. 2016)

("Although the language is broad, ambiguity does not inhere in breadth.").

### 2. The Court Did Not Abuse Its Discretion in Holding that a Home Seller's Buyer-Side Claims Involve the Same Factual Predicate.

Beyond his contractual argument that the buy-side claims were not

released, Mullis argues further that they *could not* have been, based on

the requirement that a class release covers claims arising only from the

same factual predicate. This Court has consistently held that released

claims properly "'arise out of the same factual predicate'" if the settlement

release "allows class members to pursue other claims unrelated to" the

subject of the litigation. *Uponor*, 716 F.3d at 1065. In other words, the

parties may release claims that "rest on the same or similar facts as the

class action claims," *Thompson*, 992 F.2d at 191 n.6, and courts will

enforce such a release where "'there is a realistic identity of issues between

77

the settled class action and the subsequent suit,'" *id.* at 191 (quoting *TBK Partners*, 675 F.2d at 461).

For this reason, in *General American*, this Court enforced a class settlement release covering "modal billing practices" that "were never specifically at issue in the class action." *In re Gen. Am. Life*, 357 F.3d at 804-05. There, a federal class action had challenged various misrepresentation practices arising from insurance policies (not including modal billing practices) and a settlement was reached. The settlement broadly released "all causes of action known or unknown, suspected or unsuspected, that may or could be asserted now or in the future on the basis of, connected with, or arising out of or related to the Policies in whole or in part." *Id.* Separately, a New Mexico action in state court challenged an insurer's modal billing practices arising from the same insurance policies, which alleged defendants charged a higher overall annual premium for monthly—as opposed to annual—payment. This Court had "no difficulty in concluding that the [release] judgment bars the New Mexico action." *Id.* at 803. It reasoned that "[t]here is no impropriety in including in a settlement a description of claims that is somewhat broader

78

than those that have been specifically pleaded." *Id*. at 805. This Court understood that "[i]n fact, most settling defendants insist on this." *Id*.

Likewise in *Uponor*, this Court enforced a release of all claims relating to allegedly defective brass fittings, rejecting the argument that this was "an overbroad release clause." 716 F.3d at 1065.

The district court applied the correct legal test and properly concluded that the home seller and home buyer claims share the same factual predicate. As Mullis acknowledges, the *Batton* plaintiffs and *Gibson* plaintiffs challenge the same NAR rules and alleged conspiracy. Mullis.Br.3-4. According to both sets of plaintiffs, NAR's rules allegedly "significantly restrain competition" through "anticompetitive restraints that cause home sellers to pay inflated commissions" to buyer brokers and seller brokers. March.App.184; R.Doc.232 ¶¶ 1–2. Plaintiffs claimed this alleged conspiracy affected home sellers and home buyers through a single transaction, where artificially inflated broker commissions were paid from the proceeds of a residential real estate transaction. Plaintiffs alleged that these commissions deprived home sellers of value in the proceeds of the sale and that the same commissions caused home buyers to pay an inflated

79

price for the home. All this is the same factual predicate.

Plaintiffs-Appellees challenged various NAR (and non-NAR entities') rules that allegedly caused "inflated commissions" for buyer brokers and seller brokers through "anticompetitive restraints." March.App.184; R.Doc.232 at ¶¶ 1-2; *see also id.* at 190; ¶ 13 (alleging that in "competitive but otherwise comparable foreign markets, "home buyers pay their brokers, if they choose to use one, and they pay less than half the rate paid to *buyer-brokers* in the United States" (emphasis added)); *id.* at 191; ¶ 16 (alleging that "Defendants have successfully stabilized *buyer-broker commissions* (and significantly increased the dollar cost) charged despite the diminishing role of buyer-brokers" (emphasis added)). The *Batton* complaints mirror the Plaintiffs-Appellees' reasoning, challenging the same rules and alleging that the seller contracts to pay the total commission, the seller-agent makes a commission offer to the buyer's agent, and the commissions are paid to both agents when the home sells. Def.Ex.2, *Batton I*, No. 1:21-cv-430 (N.D. Ill.), ECF No. 84 at ¶¶ 47-50; Def.Ex.3, *Batton II*, No. 1:23-cv-15618 (N.D. Ill.), ECF No.112 at ¶¶ 8-12, 22.

Appellate Case: 24-3478     Page: 96     Date Filed: 08/11/2025 Entry ID: 5546652

Given this extensive factual overlap, there is no justification to carve-out buyer-side claims from the release. As the district court recognized as a matter of logic, "every class member sold a home during the class period, and most," like Mullis, "also bought homes," often around the same time (hence the likely purpose of the sale). Cheatham.App.906-07; R.Doc.530 at ¶ 68. Indeed, both the settling Plaintiffs and the *Batton* complaint acknowledged that brokers represent sellers **and** buyers in the majority of real estate transactions, and at nearly identical rates. *Compare* March.App.232; R.Doc.232 at ¶ 123 (alleging that "86% of sellers sold their home with the assistance of a real estate broker in 2022, and 86% of buyers purchased their home with the assistance of a real estate broker in 2022"); *with* Def.Ex.2, *Batton I*, No. 1:21-cv-430 (N.D. Ill.), ECF No. 84 at ¶ 39 ("Home sellers and buyers are typically represented by brokers, including those registered with NAR. According to NAR, in 2020, 89% of sellers sold their home with assistance from a seller-broker, and 88% of buyers purchased their home with assistance from a buyer-agent.").

And contrary to Mullis's assertion, the process of "retaining a buyer-broker and shopping for and purchasing a home" **is** alleged in the settling

complaints at length. *See* March.App.230-32; R.Doc.232 at ¶ 16 ("[m]any home buyers no longer search for prospective homes with the assistance of a broker, but rather independently through online services" and "increasingly retain a buyer broker after the client has already found the home the client wishes to buy"); *id.* ¶ 17 (alleging a "disconnect between buyer broker costs and commissions" because "many, if not most, of the services that buyer brokers provide don't vary with the sales price, so the percentage fee should fall as the home price rises"); *id.* ¶ 129 (explaining the process of retaining a buyer broker, including the buyer broker contract with the buyer which "typically discloses that the buyer-broker will be compensated by receiving a commission from the listing broker"). Finally, the settlement complaint alleges that increased buyer broker commissions result in increased costs to home buyers, even if many buyers do not realize it. *See* March.App.230-32; R.Doc.232 at ¶¶ 157-59.

Facing an uphill battle in distinguishing his claims, Mullis resorts to mischaracterizing case law from the Second Circuit, which uses the phrase "identical factual predicate." Mullis.Br.17, 19 (emphasis added). Although there is no indication that the Second Circuit applies its formulation of the

Appellate Case: 24-3478    Page: 98    Date Filed: 08/11/2025 Entry ID: 5546652

standard to mean anything other than the "same factual predicate," the controlling language here in the Eighth Circuit is "same factual predicate."[20] That is the wording of the settlements. And that is the wording in this Court's controlling precedent. *See Uponor,* 716 F.3d at 1065; *see also Hufsmith v. Weaver*, 817 F.2d 455, 461 (8th Cir. 1987) (applying "same factual predicate" test in the res judicata context); *Healy v. Fox*, 46 F.4th 739, 744 (8th Cir. 2022) (same); *Crum v. Vincent*, 493 F.3d 988, 993 (8th Cir. 2007) (same). As explained above, home sellers' seller-side claims and buyer-side claims are both properly encompassed by the Gibson complaint and were properly released in the settlement agreement.

Moreover, Second Circuit precedent persuasively supports affirming the district court and the scope of the releases here. For instance, in *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, the Second Circuit concluded that antitrust tying and boycott claims met the identical factual predicate standard where both claims challenged Visa and MasterCard's

---

[20] Mullis and other objectors used the "identical factual predicate" language below, and heavily cited Second Circuit case law, but the district court concluded—correctly—that the Second Circuit's precedent would not have required a different outcome than this Court's precedent. *See* Cheatham.App.904-05; R.Doc.530, at ¶ 61, n.6.

Appellate Case: 24-3478     Page: 99     Date Filed: 08/11/2025 Entry ID: 5546652

exclusionary rules. 396 F.3d 96, 108 (2d Cir. 2005). The plaintiffs in *Wal-Mart* attempted to distinguish their claims from the prior settlement based on the type of harm caused by the rules: the new allegations claimed that Visa and Mastercard "force[d] plaintiffs to accept their *debit* cards" by tying credit and debit cards, whereas the settled claims alleged that the companies' rules reflected a group boycott that "inflated the cost of *credit* card transactions." *Id.* at 107 (emphasis added). The Second Circuit ruled that the settlement of boycott claims released the tying claims, notwithstanding the different injuries and theories alleged, because the same allegedly "exclusionary rules" were "central" to both cases. *Id.*

Similarly, in *Robertson v. National Basketball Ass'n*, the Second Circuit approved a settlement that barred a class member from presenting a variation of the same antitrust theory. 622 F.2d 34, 35 (2d Cir. 1980). Again, the claims shared an identical factual predicate because they challenged the *same* compensation *rule* as anticompetitive. Regardless of how the rule applied, the court reasoned, "[t]he dispute between the parties in both cases involved the concept of the rule, not the manner in which compensation was computed." *Id.*

84

Here, like in *Wal-Mart* and *Robertson*, claims challenging the same alleged anticompetitive rules concerning broker commissions arise out of the same factual predicate, regardless of whether Objectors-Appellants believe the alleged impact of those rules affect home sellers and home buyers in distinct ways. Although Mullis acknowledges that the *Batton* plaintiffs and *Gibson* plaintiffs challenge the same NAR rules and alleged conspiracy, (Mullis.Br.3), he insists that the challenged rules "more directly targeted home*buyers* like Appellant James Mullis." *Id.* (emphasis added). Mullis identifies "separate injury" as the "[m]ost critical[]" distinction, but this argument mirrors the reasoning rejected in *Wal-Mart*. Mullis contends that "homebuyers' claims" involve "overpaying for their homes via the inflated commission rates baked into the price (as opposed to supracompetitive broker fees they paid directly for different homes that they sold in different transactions)." Mullis.Br.31. But the *Batton* plaintiffs' "description of their damage theory" is irrelevant where, as here "claims, even if not pled" are based on the same facts "as settled class claims." *Wal-Mart*, 396 F.3d at 108.

Mullis's entire argument boils down to the unremarkable assertion

Appellate Case: 24-3478     Page: 101     Date Filed: 08/11/2025   Entry ID: 5546652

that his buyer-side claims differ only in that they target the ***indirect*** effects flowing from the same alleged conspiracy as his seller claims. But this difference does not push the buyer-side claims outside the scope of the release. As the *Batton* court observed, "homebuyers are indirect purchasers of their brokers' services because it is the home seller that pays the buyer-broker and any cost borne by the homebuyer is only by virtue of the fact that the buyer-broker's commission rate is 'baked into' the home's purchase price." *Batton v. Nat'l Ass'n of Realtors*, No. 21-cv-00430, 2024 WL 689989, at *2 (N.D. Ill. Feb. 20, 2024).

Releases in antitrust direct-purchaser settlements commonly cover all claims the settlement class members could raise against the settling defendant arising out of the same alleged conspiracy, including when those direct purchasers may also have indirect-purchaser claims. *See* Cheatham.App.916-17; R.Doc.530 at ¶ 85 (citing Def.Ex.4, Declaration, *In re Processed Egg Prods. Antitrust Litig.*, No. 2:08-md-2002 / MDL 2002 (E.D. Pa.), ECF No. 349-1 ¶ 25 (similar); Def.Ex.5, Settlement Agreement, *In re Intuniv Antitrust Litig.*, No. 16-cv-12653 (D. Mass.), ECF No. 480-1 ¶ 10 (similar); Declaration, Def.Ex.6, *In re Prograf Antitrust Litig.*, No.

86

1:11-md-2242 (D. Mass.), ECF No. 652-2 ¶ 10(a) (similar); Def.Ex.7, Settlement Agreement, *In re Pre-Filled Propane Tank Antitrust Litig.*, No. 4:14-md-2567 / MDL 2567 (W.D. Mo.), ECF No. 362-1 ¶ 12 (similar); Def.Ex.8, Settlement Agreement, *In re HIV Antitrust Litig.*, No. 3:19-cv-02573 (N.D. Cal), ECF No. 711-2 at 11-12 (similar); Def.Ex.9, Affidavit, *In re Broiler Chicken Antitrust Litig.*, No. 1:16-cv-8637 (N.D. Ill.), ECF No. 3324, ¶ 26 (similar)).

Mullis's buyer-side claims are thus based on the same factual predicate because they are limited to the direct purchasers' parallel indirect-purchaser claims that flowed from the same alleged cause. *See Batton*, 2024 WL 689989, at *2, *10 (stating that the putative home buyer class is made up of indirect purchasers and explaining that Mullis and his co-plaintiffs were not allowed to seek injunctive relief because the home sellers in *Moehrl* and *Burnett* were better suited to seek the injunctive relief sought).

In attempting to distinguish the buyer-side claims as "separate transactions," Mullis further misconstrues the legal standard. Mullis cites to no case in this Circuit holding his contrived conclusion that a

"transaction-based constraint forms the core of the identical factual predicate safeguard." Mullis.Br.32-35. In fact, this Circuit has applied a broad settlement release crafted without regard to any transaction-based limitation.

In *Thompson*, this Circuit upheld a class settlement release barring any claims "'in connection with the above-described 1983 and 1984 NRM limited partnerships.'" 992 F.2d at 190. In evaluating this "broad" release language, this Circuit did not focus on whether the claims involved the same transaction, but concluded that claims are properly released where they "rest on the same or similar facts as the class action claims," and "there is a realistic identity of issues between the settled class action and the subsequent suit." *Id.* at 191 & n.6 (quoting *TBK Partners*, 675 F.2d at 461). Similarly, the buyer-side claims necessarily share the same factual predicate with the home seller claims because they "rest on the same or similar facts" and "'there is a realistic identity of issues.'" *Id.*

This Circuit does not require "identity between transactions," and Mullis's insistence on strict adherence to a "transaction-based" standard completely contradicts this Circuit's holding in *General American*. Under

88

Mullis's unreasonably restrictive definition of a separate transaction, the monthly premium payments alleged in the New Mexico action would constitute "separate transactions" because they were paid at separate times (i.e., monthly) than the annual premiums. *See* Mullis.Br.31 (identifying "time" as one of the "hallmarks for determining whether there is identity between transactions"). But this Circuit rightly concluded that the challenges to the modal billing practices were released. *In re Gen. Am. Life*, 357 F.3d at 804-05.

To the extent this Circuit ever has articulated a transaction-based analysis, it did so with a much broader and more flexible approach. In the context of res judicata, this Circuit explained that "the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, *or series of connected transactions*, out of which the action arose." *Murphy v. Jones*, 877 F.2d 682, 684 (8th Cir. 1989) (emphasis added) (internal quotation marks and citation omitted). Here, class members who sold and also bought homes did so in a "series of connected transactions." *Id.* Mullis recognizes that "[t]he majority of class members . . . both bought and sold homes."

89

Mullis.Br.24. The actions of buying and selling homes that allegedly contained inflated agent commissions due to the alleged anticompetitive rules at issue logically share facts undergirding their "origin" and "motivation." *See Murphy*, 877 F.2d at 684. As the district court explained, "few people sell a home without first buying it. And most home sellers then buy a different home with the proceeds because they need somewhere to live." Cheatham.App.906-07; R.Doc.530 at ¶ 68.

For all of these reasons, the court did not abuse its discretion in holding that a home seller's buyer-side claims involve the same factual predicate and therefore could be, and were, released by the settlements. This Court should affirm the district court's finding that the settlements properly release class members' buyer-side claims. The district court correctly articulated the legal standards and carefully considered each of Mullis's arguments. *See* Cheatham.App.906-18; R.Doc.530 at ¶¶ 68-87. This Court should decline Mullis's invitation to unwind fair, reasonable, and adequate settlements and instead risk depriving the entire class of the valuable relief negotiated among the parties—which is a very real concern. *See Lutz v. HomeServices of America, Inc., et al*, No. 24-cv-10040,

Appellate Case: 24-3478    Page: 106    Date Filed: 08/11/2025 Entry ID: 5546652

2025 WL 2046905 (S.D. Fla. July 15, 2025) (in home buyer action arising from the same alleged conspiracy here, dismissing with prejudice purported home buyer class's claim for injunctive relief and rejecting plaintiffs' argument that "home sellers and home buyers have disparate interests" and that any such differences are "de minimis").

E.    **The District Court Properly Concluded that Claims Related to Non-NAR-Affiliated MLSs Like REBNY are Included in the Settlements.**

The district court ruled that the settlements' releases of claims "based on any or all of the same factual predicates" as the *Gibson* complaint extended to release "claims involving properties listed on non-NAR MLSs like NWMLS, WPMLS, and REBNY RLS." Cheatham.App.904-05; R.Doc.530 at ¶ 61. Rejecting March's and Friedman's objections to the release of their putative class claims on behalf of REBNY home sellers, the district court found that "the challenged REBNY rules share the same common nucleus of operative fact, and thus the same factual predicate, as *Burnett* and *Gibson*, and therefore were not 'wholly distinct' from *Burnett* or *Gibson*," and were properly released. Cheatham.App.903-04; R.Doc.530 at ¶ 60.

91

On appeal, March and Friedman argue that the district court erred for two reasons in applying the settlements' release to their claims. *First*, Friedman (but not March) argues that the district court committed legal error by failing to properly articulate the applicable standard. *See* Friedman.Br.16, 19. *Second*, both March and Friedman argue that the district court abused its discretion by finding that their putative class actions share the same factual predicate as this case. *See* March.Br.19; Friedman.Br.14.[21]

Both contentions are meritless. As discussed in Part II.A, *supra,* the district court plainly articulated the applicable legal standard with citation to *Uponor*, the controlling authority in this Circuit. And, as discussed in Part I.E.2, *infra*, the district court was well within its discretion to find that March's and Friedman's claims share the same factual predicate as Gibson's claims.

---

[21] Friedman also describes his objection in terms of "standing," but he relies exclusively on cases about the "same factual predicate" test, not standing. *See* Friedman.Br.44 (citing *In re Digit. Music Antitrust Litig*., 812 F. Supp. 2d 390, 400 (S.D.N.Y. 2011)). In his briefing below, Friedman mentioned "standing" only in one sentence each of his objections and his reply, both of which also failed entirely to cite legal precedent for the argument.

Appellate Case: 24-3478     Page: 108     Date Filed: 08/11/2025 Entry ID: 5546652

March and Friedman ask the Court to reject the factual allegations in the *Gibson* complaint and allow them to arbitrarily carve out sub-parts of *Gibson*'s alleged nationwide conspiracy so they can challenge those sub-parts in separate litigations. The REBNY home sellers putatively represented by March and Friedman are, however, entirely covered by the claims raised and settled in *Gibson*, and they will receive compensation from the settlements for allegedly paying supra-competitive broker commissions on the properties they sold through REBNY, without the costs and risks of further litigation. *See* Cheatham.App.905-06; R.Doc.530 at ¶¶ 62-65. Preventing the *Gibson* nationwide class from achieving a nationwide settlement of its nationwide allegations would harm REBNY home sellers—not to mention the rest of the *Gibson* settlement class—who, without these settlements, may not recover anything for their claims. *Cf. Fager v. CenturyLink Commc'ns, LLC*, 854 F.3d 1167, 1173 (10th Cir. 2016) ("If Defendants are going to pay anything to the class members, they would insist on a release . . . that would protect them against repeated litigation over the same subject matter.'").

Any REBNY class members unsatisfied with the settlements were certainly free to opt out, but (like class members nationally) overwhelmingly they did not. That is because the only true potential beneficiaries of blocking nationwide settlements here are the Objectors-Appellants' counsel. The district court correctly declined the self-serving requests by March's and Friedman's counsel, and this Court should affirm.

> **1. The District Court Did Not Err in Articulating the Permissible Scope of a Settlement Release.**

Relying on the Eighth Circuit's holdings in *Uponor* and *Thompson* (*see supra,* Part II.D), the district court correctly framed the legal standard for analyzing the settlements' release of claims "based on any or all of the same factual predicates." Cheatham.App.907-08; R.Doc.530 at ¶¶ 69-70. The district court applied the *Uponor* standard to conclude that March's and Friedman's claims on behalf of REBNY home sellers share "the same factual predicate" as Gibson's claim on behalf of REBNY home sellers. *See id.* ¶¶ 56-61 (citing *Uponor*, 716 F.3d at 1065).

Friedman's citation to *Zutz v. Nelson* for the "same set of facts" requirement is off-base, because that case did not require entirely the same facts to apply res judicata. *See* 601 F.3d 842, 848 (8th Cir. 2010)

(precluding subsequent federal conspiracy claims based on previous state-court defamation judgment because both cases were "anchor[ed] . . . on the same defamatory statements"). Friedman himself cites other Eighth Circuit precedent on res judicata that requires only that "the claims arise out of the same nucleus of operative facts or are based upon the same factual predicate." Friedman.Br.17 (quoting *Murphy*, 877 F.2d at 684-85 (precluding claims where "the facts involved in both claims are related in time, space, origin, and motivation")).[22]

Friedman complains, however, that the district court committed legal error by "finding that claims could be released if they share one or more, but not all, of the same underlying facts, stating that releases apply to claims that may be 'based on any or all of the same factual predicates for the claims alleged in the Actions.'" Friedman.Br.21; *see also id.* at 13, 19-20. According to Friedman, "there must be a single factual predicate, not any of multiple predicates." *Id.* at 21.

---

[22] Friedman also cites *West Alton Jones Foundation v. Chevron U.S.A.,. Inc.* (Friedman.Br.20), but that case is inapposite where it interpreted the intent of the settling parties, not the permissible scope of a release. *See* 97 F.3d 29, 35 (2d Cir. 1996).

Appellate Case: 24-3478     Page: 111     Date Filed: 08/11/2025   Entry ID: 5546652

Friedman's effort to read legal error into the district court's order fails for two reasons. *First*, Friedman mischaracterizes the district court's ruling. The district court unequivocally found that Friedman's and Gibson's claims "share the same factual predicate." Cheatham.App.904-05; R.Doc.530 at ¶ 61. The district court's reference to multiple predicates was a quote from the settlements. *See* Cheatham.App.907-08; R.Doc.530 at ¶ 70. Nevertheless, the district court correctly found that the settlements' language maps to the permissible scope of release under the law because "the releases impose no greater preclusive effect from settlement" than would have arisen from a judgment in *Gibson*. *Id*. No part of the district court's reasoning rests on a finding of "superficial similarity," as Friedman now claims. Friedman.Br.19-20.

*Second*, Friedman's all-or-nothing position—that claims have a single factual predicate, so released claims must rely on literally identical facts—is flatly contradicted by the case law. *See, e.g.*, *Thompson*, 992 F.2d at 191 n.6 (affirming release of claims that "rest on the same or similar facts as the class action claims") (citing *TBK Partners*, 675 F.2d at 461 (affirming release "where there is a realistic identity of issues between the

96

settled class action and the subsequent suit")); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 272 F. App'x 9, 13 (2d Cir. 2008) ("[T]he fact remains that the investment losses suffered by all class members share a common factual predicate, even if the particular losses were the result of reliance on different documents.").

Where the *factual predicate*—not all the underlying facts—is the same, "'the paramount policy of encouraging settlements takes precedence.'" *Thompson*, 992 F.2d at 191 (quoting *TBK Partners*, 675 F.2d at 461). As the district court correctly noted, the "same factual predicate" doctrine ought not be defined "too narrowly," lest it lead to the very "piecemeal litigation arising from the same conduct" that class-action settlements are intended to prevent. Cheatham.App.904-05; R.Doc.530 at ¶ 61 (citing *Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 807 F. App'x 752, 765-66 (10th Cir. 2020)).

Friedman's contrary suggestion—that the doctrine limits settlements to claims with literally identical facts—also cannot be squared with the numerous authorities holding that a class-action settlement can release claims not alleged in the action being settled. *See, e.g.*, *In re Gen.*

97

*Am. Life.*, 357 F.3d at 805 ("There is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded."); *Thompson,* 992 F.2d at 190-91 (affirming district court's approval of settlement that released claims which could have been but were not brought and finding that "'the situation is analogous to the barring of claims [under res judicata] that could have been asserted in the class action'") (quoting *TBK Partners*, 675 F.2d at 461); *Wal-Mart*, 396 F.3d at 108 ("[A] court may release not only those claims alleged in the complaint and before the court, but also claims 'which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in' the complaint.") (quoting *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981)). Such releases inherently extend to claims that would require proof of additional facts beyond the alleged claims—thus, March's assertion that "when proof of further facts is required, a claim cannot be released," March.Br.40; *cf.* Friedman.Br.13, is belied by governing case law.

Friedman's citations on this point do not support him. Friedman quotes *Super Spuds* for a "same set of facts" requirement, Friedman.Br.21,

Appellate Case: 24-3478    Page: 114    Date Filed: 08/11/2025 Entry ID: 5546652

but that case must be understood in light of the Second Circuit's subsequent holdings, which require only a common set of facts to satisfy the same factual "predicate" requirement. *See, e.g.*, *Wal-Mart*, 396 F.3d at 110 (discussing *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 (2d Cir. 1981)); *TBK Partners*, 675 F.2d at 462 (same). Similarly, Friedman's citation to *In re Digital Music Antitrust Litigation* for a "very same set of facts" rule, Friedman.Br.94, ignores that the district court there was applying the same Second Circuit authority requiring only *a* common set of facts. *See* 812 F. Supp. 2d at 399 (quoting *TBK Partners*, 675 F.2d at 461).[23]

While Friedman obviously disagrees with the district court's conclusion that the *Gibson*, *March*, and *Friedman* complaints all share the same factual predicate, that conclusion is a proper exercise of the district

---

[23] Moreover, that case illustrates how completely dissimilar claims must be to preclude a broad class settlement release. There, the settlement related to allegations regarding the sale of CDs, while the new claims involved the online music market. *See In re Digit. Music Antitrust Litig.*, 812 F. Supp. 2d at 400. The two claims thus involved entirely separate products, unlike here where all claims concern the same alleged conduct, price fixing, of the same type of residential real estate commissions (indeed, the commissions on the same transactions)).

Appellate Case: 24-3478    Page: 115    Date Filed: 08/11/2025 Entry ID: 5546652

court's discretion. There was no legal error in the district court's ruling, which properly focused on whether the factual predicate—the core facts—of the cases is the same. *See* Cheatham.App.904-05; R.Doc.530 at ¶ 61.

### 2. The District Properly Applied the "Same Factual Predicate" Doctrine Here to Find That March's and Friedman's Claims Are Settled.

As an exercise of judicial discretion, the district court's decision must be affirmed so long as it stayed within its permissible "range of choice." *Qwest Commc'ns Corp. v. Free Conferencing Corp.*, 920 F.3d 1203, 1206 (8th Cir. 2019). That range includes the case-specific application of legal doctrines, including the same factual predicate standard. *See In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011) (this Court reviews "application of the law for an abuse of discretion"). The district court here acted well within its discretion and should be affirmed.

The district court identified at least two independently sufficient reasons to conclude that Gibson's, March's, and Friedman's claims all share the same factual predicate: *First*, the operative complaint in *Gibson* explicitly included claims arising from the REBNY commissions, foreclosing any argument that those claims were outside the factual

100

predicate at issue. *Second*, March and Friedman themselves alleged that their REBNY-related claims were derivative of the similar conspiracy involving NAR found in *Burnett* and alleged to exist nationwide in *Gibson*. *See* Cheatham.App.901-06; R.Doc.530 at ¶¶ 55-67.[24] The district court can and should be affirmed based on either or both rationales.

### (1) March's And Friedman's Positions Are Foreclosed by the *Gibson* Complaint.

In affirming the district court's ruling on the "same factual predicate" doctrine, this Court need look no further than the district court's observation that "Plaintiffs here plead a nationwide conspiracy on behalf of a nationwide class that expressly challenges rules adopted by the [REBNY listing service]." Cheatham.App.901-02; R.Doc.530 at ¶ 56. Moreover, *Gibson*'s alleged nationwide conspiracy that allegedly had

---

[24] The district court also found that "the evidentiary records in *Burnett* and *Moehrl*" based on its years-long experience with those cases were "consistent with Plaintiffs' allegations in *Gibson*," which the court took as further support for finding a shared factual predicate for claims against NAR's rules and REBNY's rules. Cheatham.App.903-04; R.Doc.530 at ¶ 60. As the proponents of that evidence, Plaintiffs-Appellees are better positioned to defend it, but March and Friedman have failed on appeal to show the district court's finding was an abuse of discretion. Defendants-Appellees, of course, deny all allegations of wrongdoing in the *Gibson*, *March*, and *Freidman* complaints.

Appellate Case: 24-3478    Page: 117    Date Filed: 08/11/2025 Entry ID: 5546652

nationwide anticompetitive effects, was implemented via similar anticompetitive policies in various locations, similarly inflated commissions on the property sales during the same period, and involved similar conduct by defendant brokerages around the country. *See* Cheatham.App.901-03; R.Doc.530 at ¶¶ 56-58. Specifically, the *Gibson* Complaint alleges that "[a] handful of MLSs" "are not exclusively owned or operated by NAR associations" but that those MLSs nonetheless are (1) "typically controlled by REALTOR® associations and/or NAR-aligned brokerages and are not fully independent from NAR" and (2) "generally subject to the same or similar anticompetitive restraints that apply in MLSs that are under NAR's formal control, including because: (i) all realtor members of non-NAR MLSs are subject to NAR's Code of Ethics; and (ii) each non-NAR MLS has adopted the same or similar anticompetitive restraints as those imposed by NAR on its affiliated MLSs." Friedman.App.320-25; R.Doc.232 at 58-59 ¶ 182. The *Gibson* Complaint then lists REBNY and RLS as an example. *Id.* at 61 ¶ 182.

March's and Friedman's response is simply to argue that the *Gibson* allegations are "not true" and "inaccurately characterized," March.Br.45,

102

or that they "have no factual basis" and "are simply unsupported," Friedman.Br.39-40, 42. Defendants-Appellees, of course, deny that *any* of the three plaintiff classes' conspiracy allegations are accurate. But settlements are not meant to establish the validity of allegations one way or another. *See S.E.C. v. Citigroup Glob. Mkts. Inc.,* 673 F.3d 158, 166 (2d Cir. 2012) ("It is commonplace for settlements to include no binding admission of liability."); *cf. Marshall*, 787 F.3d at 518 ("Although this Court has not specifically defined how much precision a district court must use in evaluating the strength of the plaintiffs' case, we have previously explained that 'in approving a settlement[,] the district court need not undertake the type of detailed investigation that trying the case would involve.'") (quoting *Van Horn*, 840 F.2d at 607). Regardless, March's and Friedman's efforts to deny the allegations in *Gibson* is fatal to their arguments on the "same factual predicate" and the district court's decision should be affirmed on this ground alone.

> (2) **The "Same Factual Predicate" Can Be Determined Without Resolving Contested Allegations.**

Even if March and Friedman believe that *Gibson's* version of the challenge to REBNY's commission rules relies on inaccurate allegations, that does not change their reliance on the same factual predicate. All three complaints allege: (i) classes including REBNY home sellers, Def.Ex.11, Am. Compl., *March v. Real Est. Bd. of N.Y., Inc.*, No. 1:23-cv-9995-JGLC-RWL (S.D.N.Y. May 7, 2024), ECF No. 189 at ¶ 138; Def.Ex.13, Am. Compl., *Friedman v. Real Est. Bd. of N.Y., Inc.*, No. 1:24-cv-405-JGLC-RWL (S.D.N.Y. May 3, 2024), ECF No. 77 at ¶ 130. Friedman.App.349-50; R.Doc.232 at ¶ 246 (*Gibson* Am. Compl.); (ii) inflated commissions on properties listed and sold through REBNY, Def. Ex.11, *March* Am. Compl. ¶ 149; Def.Ex.13 *Friedman* Am. Compl. ¶ 141; *see* Friedman.App.320-25; R.Doc.232 at ¶ 182 (*Gibson* Am. Compl.); (iii) the same REBNY rules causing the inflation of commissions, Def.Ex.11, March Am. Compl. ¶ 152; *Friedman* Am. Compl. ¶ 144; *see* Friedman.App.320-25; R.Doc.232 at ¶ 182 (*Gibson* Am. Compl.); (iv) overlapping sets of defendant brokerages implementing REBNY's rules, Def.Ex.11, *March* Am. Compl. ¶¶ 23-50; Def.Ex.13, *Friedman* Am. Compl. ¶¶ 9-26; Friedman.App.279-97; R.Doc.232 at ¶¶ 32-116 (*Gibson* Am. Compl.); and (v) an antitrust

conspiracy to inflate commissions by manipulating listing service rules, Def.Ex.11, *March* Am. Compl. ¶¶ 165-77; Def.Ex.13, *Friedman* Am. Compl. ¶¶l39-48; *see* Friedman.App.352; R.Doc.232 at ¶ 258 (*Gibson* Am. Compl.).

They vary only in that March and Friedman reference "slight differences" in the nature of the alleged REBNY conspiracy and NAR conspiracy that are neither "material [n]or sufficient to create a distinct factual predicate." Cheatham.App.904-05; R.Doc.530 at ¶ 61. March and Friedman also limit themselves to a borough of New York City each and to properties listed through REBNY, whereas Gibson's allegations are nationwide and apply to all listing services, regardless of affiliation.

March and Friedman go to great pains to describe differences between REBNY's commission rules and NAR's commission rules, but that misses the point. The *Gibson* allegations include that the alleged nationwide conspiracy affected listing-service rules nationwide, regardless of NAR affiliation, in part because the defendant brokerages allegedly influenced the listing services to have similarly anticompetitive rules nationwide using the same conduct. *See* Cheatham.App.901-03; R.Doc.530

105

at ¶¶ 56-58. Thus, the *Gibson* claims arise from REBNY's rules as much as the *March* and *Friedman* claims. *See* Cheatham.App.901-02; R.Doc.530 at ¶ 56.

Notwithstanding March's and Friedman's efforts to frame events in Manhattan and Brooklyn as divorced from the rest of the country, the alleged REBNY conspiracy is best understood as a regional subset of the alleged nationwide conspiracy. March's and Friedman's claims thus necessarily share the same factual predicate as the alleged nationwide conspiracy, despite any alleged local variation in how it was implemented. *See Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1290 (11th Cir. 2007) ("The [original action] alleged an overarching scheme . . . , a broad nucleus of fact that would encompass the fraud claims now being alleged by the appellants."); *In re Prudential Ins. Co.*, 148 F.3d at 311 ("That overarching scheme is the linchpin of [the complaint], regardless whether each class member alleges a churning claim, a vanishing premium claim, an investment plan claim, or some other injury . . . ."). Given its allegation of a nationwide conspiracy, the *Gibson* class is entitled to settle on behalf of the full class of allegedly injured plaintiffs, including REBNY home

106

sellers, for the alleged conspiracy to inflate those commissions—notwithstanding that March and Friedman have (at least in their own view) alleged an alternative theory for how a particular piece of the alleged conspiracy operated in New York City (in extremely similar ways).

Not only is Eighth Circuit precedent squarely on point (*see* Part II.E.1, *supra*), but March and Friedman rely heavily on Second Circuit precedent, rather than the controlling standard in *Uponor* and this court's other decisions on point. Even under non-controlling Second Circuit precedent, however, alternative antitrust theories based on the same allegedly anticompetitive rules share the same (or identical) factual predicate. *See supra* Part II.D.2 (discussing *Wal-Mart*, 396 F.3d at 107) (affirming that the class settlement of an initial case alleging a horizontal boycott between Visa and Mastercard also released a subsequent class's allegations that the card companies engaged in tying). In *Wal-Mart*, it did not matter that the later plaintiffs claimed an injury flowing directly from the tying arrangement while the earlier plaintiffs had claimed an injury from exclusion of would-be market entrants, any more than it mattered that a vertical tying claim requires proof of facts (like the arrangement's

Appellate Case: 24-3478    Page: 123    Date Filed: 08/11/2025    Entry ID: 5546652

existence) that would be irrelevant in a horizontal boycott case, and vice versa. 396 F.3d at 108. Those distinctions, like March's and Friedman's arguments here, "miss[] the mark." *Id.*

In *Wal-Mart*, as here, the settlement released claims based on the allegedly anticompetitive rules and their allegedly anticompetitive impact regardless of the specific contours of each alleged antitrust violation. *See also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 749 (9th Cir. 2006) (holding same settlement in *Wal-Mart* also released claims based on a price-fixing theory); *In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, 261 F.3d 355, 367 (3d Cir. 2001) (affirming that settlement released all claims based on "the sales practices and factual predicates" in a prior action, because to do otherwise "would seriously undermine the possibility for settling any large, multi-district class action"); *Freeman v. MML Bay State Life Ins. Co.*, 445 F. App'x 577, 579 (3d Cir. 2011) ("The fact that the plaintiffs in [the settled case] were challenging different [defendant] practices with respect to the policies does not mean that the factual predicates are different."); *Adams*, 493 F.3d at 1289-90 (holding that settlement in a case about flexible premium policies released later claims

108

about the same type of policy, even though the prior case alleged "premiums that failed to disappear after a period of time" and the latter case alleged "premiums that would suddenly increase without warning").

Friedman relies on *Hesse v. Sprint Corp.*, but that case also supports finding the same factual predicate here. *See* 598 F.3d 581 (9th Cir. 2010). There, the Ninth Circuit noted that it had previously affirmed "releas[ing] not only the state law fraudulent billing claims before it, but also federal RICO claims arising from the same billing practices." *Id.* at 591 (citing *Howard v. Am. Online Inc.*, 208 F.3d 741, 746-48 (9th Cir. 2000)). The district court here likewise released all claims arising from the same alleged anticompetitive commission rules, whether promulgated by NAR or REBNY.

*Hesse* found different predicates in claims that "dealt exclusively with specific nationwide surcharges to recoup the costs of compliance with federal programs" versus claims based on a "statewide surcharge to recoup the cost of [state tax] allegedly in violation of [state law]." 598 F.3d at 591. The state-surcharge claims there, despite conceptual similarity, had zero factual overlap with the settled federal-surcharge claims. *Id.* ("Both

109

involve claims that Sprint improperly billed government taxes or fees to its customers, but they deal with different surcharges, imposed to recoup different costs, that were alleged to be improper for different reasons."). Here, however, all three complaints allege the same REBNY rules inflated the commissions on the same real estate transactions. Thus, the "same factual predicate" doctrine permits a full release.[25]

### 3. March's And Friedman's Positions Frustrate the Purposes of Settlement and Would Harm Class Members.

The purpose of settlement is to address the risks faced by both sides from proceeding further in litigation *without* the burden of litigating the parties' disputes to resolution. *See Marshall*, 787 F.3d at 518 ("The very purpose of compromise is to avoid the delay and expense of . . . a trial[.]") (citation omitted); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods.*

---

[25] Other cases cited off-handedly by March or Friedman are no more helpful to their position. *See In re W. States Wholesale Nat. Gas Antitrust Litig.*, 725 F. App'x 560, 561 (9th Cir. 2018) (separate classes alleged, respectively, that they paid inflated prices on natural gas and on futures contracts); *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 118-20 (S.D.N.Y. 2010) (noting settlement in case where a single defendant that allegedly imposed a deceptive fee did not release later action alleging a horizontal agreement to fix prices).

110

*Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.").

March and Friedman, however, implausibly argue that the "same factual predicate" standard precludes a class representative from settling claims at all if another class member merely objects to the validity of the class complaint, as opposed to the fairness of the settlement. *See, e.g.*, March.Br.45-46; Friedman.Br.39-42. Their position would effectively give a veto over class settlement to anyone willing to sign a complaint alleging the same injury under an alternate legal theory, or in a subset of the broader geographic market, so long as it required proof of *some* different fact.

Even if the Court accepted March's and Friedman's alternative theory (which this Court should not), those who sold homes on REBNY's RLS are readily ascertainable members of the class (many of whom filed claims). Their alleged payment of inflated real estate commissions due to the same, or strikingly similar, alleged anticompetitive rules will be compensated on a pro rata basis as is true for the entire class.

111

Moreover, the district court was not required to narrow the scope of resolved claims to exclude REBNY claims simply because Friedman believed the *Gibson* Complaint lacked sufficient evidentiary support in discussing those claims. *Cf.* Friedman.Br.40-42 (alleging "*no* factual support for any conclusion" that RLS broker "follow NAR's rules"). Instead, the district court properly considered "[t]he merits of the plaintiffs' case weighed against the terms of the settlement," Cheatham.App.884; R.Doc.530 at ¶ 28, which is all that *Van Horn* requires by way of assessment of the facts alleged. Whether a complaint is correct in all of its particulars simply is not part of the Rule 23(e) review process. *See Van Horn*, 840 F.2d at 607 ("[I]n approving a settlement[,] the district court need not undertake the type of detailed investigation that trying the case would involve …."); *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995) ("[W]hile it is incumbent on the district court to determine the propriety of the settlement, it need not resolve all of the underlying disputes …."). And Friedman cites *no* authority holding that the "same factual predicate" standard requires such a detailed evidentiary inquiry.

Appellate Case: 24-3478    Page: 128    Date Filed: 08/11/2025    Entry ID: 5546652

Imposing the Objectors' proposed fact-finding process on a settlement approval would undermine the value to all parties in avoiding litigation over multiple permutations of claims that arise from the same issue. March's and Friedman's arguments would not be confined to them or to the REBNY claims—other rival plaintiffs' counsel would, if provided the opening, be just as free to object, to point to some other supposed factual uncertainty, and to upend the entire settlement until that uncertainty was resolved on the merits. In a complex antitrust case like this one, reaching a settlement that extinguishes all claims would become virtually impossible. *See Wal-Mart*, 396 F.3d at 106 ("Broad class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country. Practically speaking, class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability." (alteration and internal quotation marks omitted).

Granting relief to March and Friedman would not only harm the putative class members in their cases by excluding them from the *Gibson*

113

settlement class, it would also harm all the other *Gibson* class members by invalidating their settlements. Defendants-Appellees paid the settlement amounts in exchange for a nationwide resolution, and all class members, including REBNY home sellers, have overwhelmingly accepted that offer by not objecting or opting out. If that national peace is suddenly subject to a large geographic carve-out, the settlements' value would necessarily need to be adjusted downward, which could easily unravel the settlements.[26]

Here, the *Gibson* plaintiffs' counsel represent REBNY claimants just as surely as do March's and Friedman's counsel, and they had all the same incentives to fairly negotiate for the maximum value of the claims at issue. *See Wal-Mart*, 396 F.3d at 111 (noting that because "every member of [the relevant sub-classes] is a member of instant class," "their interests are

---

[26] *See* Cheatham.App.71-72; R.Doc.161-2 at ¶ 43 (Compass); Cheatham.App.105; R.Doc.161-3 at ¶ 43 (Real Brokerage); Cheatham.App.137-38; R.Doc.161-4 at ¶ 43 (Realty ONE); Cheatham.App.177-78; R.Doc.161-5 at ¶ 43 (At World Properties); Cheatham.App.213-14; R.Doc.161-6 at ¶ 43 (Douglas Elliman); Cheatham.App.331-32; R.Doc.294-1 at ¶ 43 (Redfin); Cheatham.App.364-65; R.Doc.294-1 at ¶ 43 (Engel & Völkers); Cheatham.App.430-31; R.Doc.303-1 at ¶ 43 (United Real Estate); Cheatham.App.467; R.Doc.303-1 at ¶ 43 (HomeSmart).

Appellate Case: 24-3478    Page: 130    Date Filed: 08/11/2025 Entry ID: 5546652

. . . aligned"). As in *Uponor*, "[a]ll class members here share the common objective of recovering costs associated with" the relevant product, whether defective brass fittings there, or allegedly inflated real estate commissions here. 716 F.3d at 1064.

The approach proposed by March and Friedman would instead benefit only the individual class representatives (themselves) and plaintiffs' counsel in their cases, not the nationwide settlement class, nor even the putative classes March and Friedman seek to represent.

### 4. March's And Friedman's Own Complaints Allege Commonality Between Challenges to REBNY's and NAR's Rules.

March's and Friedman's own complaints detail the direct relationship between allegations regarding NAR's rules and their alleged REBNY conspiracy; these allegations present an independent, fatal weakness in March's and Friedman's positions. *See* Cheatham.App.903; R.Doc.530 at ¶ 59. The timing and substance of March's and Friedman's own complaints make it clear "'there is a realistic identity of issues between the settled class action and the[ir] subsequent suit[s].'" *Thompson*, 992 F.2d at 191 (quoting *TBK Partners,* 675 F.2d at 461).

115

The *March* and *Friedman* complaints against REBNY are directly tied to the litigation against NAR. March and Friedman transparently filed their cases as follow-ons to the large jury verdict achieved in *Burnett*. On October 31, 2023, the same counsel representing Gibson won a trial against NAR and certain brokerages in *Burnett* regarding essentially the same alleged antitrust conspiracy, albeit limited at that point only to the Missouri region. That same day, Gibson filed his complaint alleging a nationwide conspiracy on behalf of a nationwide class. It was just a few days later that March filed his complaint (on November 11th) alleging a conspiracy confined to Manhattan. Friedman followed the next month (on December 29th) with a complaint closely tracking March's allegations, but confined, instead, to Brooklyn.

Both March and Friedman deliberately highlighted the connections between their allegations and the trial judgment in *Burnett*. March's original complaint specifically alleged that the "anticompetitive nature of this co-operative effort has been acknowledged by the broker-Defendants" in *Burnett*. Def.Ex.10, Compl., *March v. Real Est. Bd. of N.Y., Inc.*, No. 1:23-cv-9995-JGLC-RWL (S.D.N.Y. Nov. 13, 2023), ECF No. 1 ¶ 67 & n.10.

116

March included an entire section of that complaint dedicated to "CURRENT LITIGATION CONCERNING THE NAR'S BUYER BROKER COMMISSION RULE," in which he highlighted the similarities between NAR's rules and REBNY's rules. *See id.* ¶¶ 99-124.

Friedman now tries to distance himself from March,[27] but he too focused squarely on the *Burnett* verdict, which he said showed that "[a] jury has already found NAR and several brokerage firms liable for violating federal and state antitrust laws in a case *with allegations substantially similar to those in this complaint.*" Def.Ex.12, Compl., *Friedman v. Real Est. Bd. of N.Y., Inc.*, No. 1:24-cv-405-JGLC-RWL (S.D.N.Y. Jan. 18, 2024), ECF No. 1 ¶ 81 & n. 16 (emphasis added). It was only in Friedman's amended complaint, filed the next month, that he subsequently alleged that there was any separation at all between NAR's

---

[27] Friedman implies his alleged Brooklyn conspiracy might be separate from the alleged nationwide conspiracy even if March's alleged Manhattan conspiracy is not. *See* Friedman.Br.27. It cannot be that Gibson's alleged nationwide conspiracy is separate from Friedman's putative class using REBNY in Brooklyn, but identical with respect to March's putative class using REBNY in Manhattan. This is yet another factual disagreement, moreover, that need not be resolved prior to approval of settlements releasing all such claims. *See Marshall*, 787 F.3d at 509.

Appellate Case: 24-3478     Page: 133     Date Filed: 08/11/2025 Entry ID: 5546652

liability and REBNY's liability. Def.Ex.13, Am. Compl. *Friedman v. Real Est. Bd. of N.Y., Inc.*, No. 1:24-cv-405-JGLC-RWL, (S.D.N.Y. Jan. 18, 2024), ECF No. 77 ¶ 83 (alleging that NAR and REBNY have "perpetrated a similar, but separate, conspiracy"); *see also id.* ¶ 84 & n.25. That supposed "separat[ion]," however, is belied by the rest of Friedman's allegations (and all of March's complaint), which repeatedly highlighted the similarities between NAR and REBNY. Even in his amended complaint, Friedman extensively discussed NAR's rules and other listing services' rules as all similarly anticompetitive to REBNY's rules. *See id.* ¶¶ 86-97.

In March's and Friedman's own words, REBNY's and NAR's commission rules are fundamentally similar and allegedly had the same purpose and effect. March alleged that, "like REBNY's rule, NAR's Buyer Broker Commission Rule required a Seller Broker to include a blanket offer of compensation to a Buyer Broker when listing a property for sale on a NAR-affiliated MLS." Def.Ex.11, Corrected Am. Compl., *March v. Real Est. Bd. of N.Y., Inc.*, No. 1:23-cv-9995-JGLC-RWL (S.D.N.Y. May 7, 2024), ECF No. 189 ¶ 125. March further alleged that "NAR regulations"

were, "in effect, *the same rule as REBNY.*" *Id.* ¶ 94 (emphasis added). Friedman alleged that, "[l]ike REBNY, both NAR and [another listing service] established rules that require Sellers to make blanket, unilateral, and effectively non-negotiable offers of compensation to Buyer Brokers whenever Seller Brokers list a home for sale on an MLS." Def.Ex.13, Am. Compl., *Friedman v. Real Est. Bd. of N.Y., Inc.*, No. 1:24-cv-405-JGLC-RWL (S.D.N.Y. May 3, 2024), ECF No. 77, ¶ 88.

March and Friedman thus allege that the NAR rules challenged in *Gibson* are fundamentally similar to REBNY's rules and point to the jury verdict against NAR in *Burnett* as evidence supporting the alleged conspiracy involving REBNY. March and Friedman themselves—in addition to Gibson—thus clearly allege a shared factual predicate connecting NAR and REBNY.

Moreover, beyond highlighting various immaterial differences between REBNY's and NAR's rules, neither March nor Friedman identify any material factual basis on which to allege there were two distinct conspiracies. While they each highlight that REBNY operates independently from NAR, they both ignore the extensive overlap in

119

brokerage defendants. Further, they both allege—like in *Gibson*—that the brokerage defendants were essential to the alleged conspiracy to inflate commissions. *See* Def.Ex.11, Corrected Am. Compl. *March v. Real Est. Bd. of N.Y., Inc.*, No. 1:23-cv-9995-JGLC-RWL (S.D.N.Y. May 7, 2024), ECF No. 189 ¶ 150 (alleging defendant brokerages "participated in the establishment, implementation, and enforcement" of REBNY's rules); Def.Ex.13, Am. Compl., *Friedman v. Real Est. Bd. of N.Y., Inc.*, No. 1:24-cv-405-JGLC-RWL (S.D.N.Y. May 3, 2024), ECF No. 77 ¶ 20. The common thread of brokerage defendants with nationwide operations allegedly integral to implementation of listing service rules nationwide is fundamentally incompatible with the idea that there were separate conspiracies.

Objectors-Appellants' own words should be dispositive here. March and Friedman cannot credibly maintain that a nationwide alleged conspiracy of brokerages was entirely disconnected from those very same brokerages allegedly doing the same thing in Manhattan and Brooklyn. *See, e.g.*, *United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014) (noting conspiracy does not require explicit agreement, but only "'a tacit

Appellate Case: 24-3478      Page: 136      Date Filed: 08/11/2025   Entry ID: 5546652

understanding to carry out the prohibited conduct'"); *United States v. Gehl*, 128 F.4th 1001, 1006 (8th Cir. 2025).

March's and Friedman's own allegations concede the connection and similarity between NAR's rules and REBNY's rules. The district court therefore correctly found that March and Friedman "filed complaints expressly linking their claims to the rules challenged in *Gibson*, including those adopted by NAR," and that by their own admission, "the challenged NAR and REBNY rules are functionally identical." Cheatham.App.903; R.Doc.530 at ¶ 59. They cannot now undo that position merely because it has become inconvenient for them.

### 5. Arguments Not Accepted by the JPML Do Not Change the Analysis.

The district court adequately considered, and correctly rejected, March's and Friedman's efforts to leverage the Judicial Panel on Multidistrict Litigation ("JPML") process to camouflage the same predicate presented by their own complaints. March and Friedman cannot rely on briefing to the JPML to unwind their own explicit linkages between the NAR and REBNY commission rules. Indeed, apart from the JPML decision itself, no statement made in the JPML proceedings is binding on

Appellate Case: 24-3478     Page: 137     Date Filed: 08/11/2025 Entry ID: 5546652

any party here. Neither March nor Friedman has argued for judicial estoppel, either below or on appeal; thus, they have waived the argument. *See Koehler v. Brody*, 483 F.3d 590, 599 (8th Cir. 2007) (conclusory statements and one footnote insufficient to preserve issue). And wisely so, because even a brief review of that doctrine shows that it does not apply here where the statements at issue are only legal arguments, arguments that did not prevail in the JPML, and any change in position has provided those defendants no advantage: they are all now paying to settle all the claims at issue, including the REBNY claims. *See Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006).

Centralization of proceedings before the JPML has no relationship to the same factual predicate doctrine; instead, it is governed by a specific statute, 28 U.S.C. § 1407. That certain Defendants (but not all) previously argued against centralization of the *Gibson* and REBNY actions is hardly dispositive of the instant question of whether those actions share a same factual predicate. *See In re Tyson Foods, Inc., Meat Processing Facilities Fair Labor Standards Act Litig.*, 581 F. Supp. 2d 1374, 1375 (J.P.M.L. 2008) (considering whether common questions of fact "are sufficiently

122

complex and/or numerous to justify Section 1407 transfer," not whether cases share the same factual predicate).

Moreover, developments in the *Gibson* litigation prior to settlement eliminate the force of any statements to the JPML regarding the scope of the *Gibson* allegations. As an initial matter, both Compass and Engel & Völkers formally withdrew their statements opposing centralization. *See* Def.Exs.14-16, *In re: Real Est. Comm'n Antitrust Litig.*, MDL Case No. 3100 (J.P.M.L.), ECF Nos. 541, 547, 548; Cheatham.App.903; R.Doc.530 at ¶ 59, n.5. And, crucially, the *Gibson* plaintiffs amended their complaint after the JPML's decision, clarifying that they allege a nationwide conspiracy that includes REBNY and other regional listing services. *See* Friedman.Br.263; R.Doc.232. All the various statements made in the JPML proceedings regarding similarity and dissimilarity of the *Gibson* action and other cases were therefore made at an earlier time when the *Gibson* action may not have explicitly referenced REBNY.

And, perhaps most importantly, the JPML itself resolved the debate, pointing to the prospect of further *nationwide* settlements as the basis for its decision not to centralize. *See* Def.Ex.17, Order Denying Transfer, *In*

123

*re: Real Est. Comm'n Antitrust Litig.*, MDL Case No. 3100 (J.P.M.L. Apr. 12, 2024), ECF No. 558 at 4. The JPML specifically noted, in fact, that the then-recent NAR nationwide settlement gave "MLSs that are not owned by an NAR affiliate," such as REBNY, a "mechanism . . . to opt-in." *See id.* The JPML further recognized "the broad contours of this new settlement" that "may well resolve at least some claims in this litigation, if not many." *Id.*

The district court was thus correct in finding that "on balance" the JPML proceedings tend to show a shared factual predicate. Cheatham.App.903; R.Doc.530 at ¶ 59 n.5. Insofar as the JPML proceedings have any relevance here, their outcome only strengthens the inference that the various actions could fairly be resolved through singular, nationwide settlements.

The district court fully engaged with March's and Friedman's positions, including all the arguments that they present on appeal, and correctly rejected them. *See* Cheatham.App.901-06; R.Doc.530 at ¶¶ 55-67. The district court went far beyond its obligations to provide "a clear understanding of the grounds" for its decision. *E.E.O.C. v. Milavetz &*

124

*Assocs., P.A.*, 863 F.2d 613, 615 (8th Cir. 1988) (internal quotation marks omitted). That March and Friedman now seek to disrupt these nationwide settlements through spurious arguments contrary to binding case law hardly undermines the district court's sound exercise of discretion. This Court should affirm the district court's finding that March's and Friedman's claims related to REBNY's RLS are included in the settlements.

## CONCLUSION

For all the reasons set forth above, this Court should affirm the district court's final approval of the settlements.

Appellate Case: 24-3478   Page: 141   Date Filed: 08/11/2025   Entry ID: 5546652

Dated: August 4, 2025

Respectfully submitted:

/s/ Chahira Solh

Chahira Solh (# 25-0084)
Daniel A. Sasse (# 25-0046)
**CROWELL & MORING LLP**
3 Park Plaza, 20th Floor
Irvine, CA 92614
T: (949) 263-8400
F: (949) 263-8414
csolh@crowell.com
dsasse@crowell.com

*Attorneys for Compass, Inc.*

/s/ James D. Lawrence

James D. Lawrence
**BRYAN CAVE LEIGHTON PAISNER LLP**
1200 Main St., Suite 3800
Kansas City, MO 64105
Telephone: (816) 374-3200
Email: jim.lawrence@bclplaw.com

Barbara A. Smith
**BRYAN CAVE LEIGHTON PAISNER LLP**
211 North Broadway, Suite 3600
St. Louis, MO 63102
Telephone: (314) 259-2367
Email:
barbara.smith@bclplaw.com

*Attorneys for Five D I, LLC
(d/b/a United Real Estate)*

/s/ David Marroso

David Marroso
Craig P. Bloom
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700
Email: dmarroso@omm.com
Email: cbloom@omm.com

*Attorneys for The Real Brokerage
Inc. and Real Broker, LLC*

/s/ Scott Eric Anderson

Scott Eric Anderson
Cameron N. Regnery
**FREEMAN MATHIS & GARY, LLP**
100 Galleria Parkway, Suite 1600
Atlanta, GA 30339
Telephone: (770) 818-0000
Email: scott.anderson@fmglaw.com
Email:
cameron.regnery@fmglaw.com

*Attorneys for HomeSmart
International, LLC*

126

/s/ Christopher M. Loveland

Christopher M. Loveland
**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, DC 20006
Telephone: (202) 747-1924
Email: cloveland@sheppardmullin.com

*Attorney for Realty ONE Group, Inc.*

/s/ Robert J. Palmersheim

Robert J. Palmersheim
Molly K. McGinley
Timothy G. Parilla
**HONIGMAN LLP**
155 N. Wacker Dr., Suite 3100
Chicago, IL 60606
Telephone: (312) 429-6032
Email: rpalmersheim@honigman.com
Email: mmcginley@honigman.com
Email: tparilla@honigman.com

*Attorneys for At World Properties, LLC*

/s/ Edward M. Spiro

Edward M. Spiro
Robert J. Anello
**MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.**
565 Fifth Ave.
New York, NY 10017
Telephone: (212) 856-9600
Facsimile: (212) 856-9494
Email: ranello@maglaw.com
Email: espiro@maglaw.com

*Attorneys for Douglas Elliman Realty, LLC and Douglas Elliman Inc.*

/s/ Michael L. Sibarium

Michael L. Sibarium
Drew A. Navikas
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1200 17th St. N.W.
Washington, DC 20036
Telephone: (202) 663-9202
Email: michael.sibarium@pillsburylaw.com
Email: drew.navikas@pillsburylaw.com

*Attorneys for Engel & Völkers Americas, Inc. & Engel & Völkers GmbH*

Appellate Case: 24-3478    Page: 143    Date Filed: 08/11/2025 Entry ID: 5546652

*/s/ Gerald A. Stein*

Gerald A. Stein
**DAVIS WRIGHT TREMAINE LLP**
1251 Avenue of the Americas, 21st
Floor
New York, NY 10020
Telephone: (212) 402-4095
Email: geraldstein@dwt.com

Robert J. Maguire
MaryAnn T. Almeida
Emily Parsons
**DAVIS WRIGHT TREMAINE LLP**
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: (206) 757-8187
Email: robmaguire@dwt.com
Email: maryannalmeida@dwt.com
Email: emilyparsons@dwt.com

*Attorneys for Redfin Corporation*

128

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), I hereby certify that the textual portion of the foregoing brief (exclusive of the disclosure statement, tables of contents and authorities, certificates of service and compliance, but including footnotes) contains 21,773 words as determined by the word counting feature of Microsoft Word 365, and in compliance with the Court's June 11, 2025 Order permitting Defendants-Appellees to file a brief not to exceed 25,000 words. The brief was prepared in 14-point Century Schoolbook font.

Pursuant to Circuit Rule 28A(h), I also hereby certify that an electronic file of this Brief has been submitted to the Clerk via the Court's CM/ECF system. The file has been scanned for viruses and is virus-free.

Dated: August 4, 2025

Respectfully submitted,

*/s/ Chahira Solh*
Chahira Solh

*Attorney for Defendant-Appellee Compass, Inc*

Appellate Case: 24-3478    Page: 145    Date Filed: 08/11/2025 Entry ID: 5546652

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: August 4, 2025

Respectfully submitted,

*/s/ Chahira Solh*
Chahira Solh

*Attorney for Defendant-Appellee*
*Compass, Inc*